WOODS v. STATE, 43 Miss. R., 364.

### HOMICIDE.

The separation and dispersion of the jury, in a capital case, has always the effect to vitiate a verdict of guilty.

The separation and disperson of a jury, in a capital case, though by the consent, or even at the request of the prisoner on trial, vitiates a conviction.

If it appear that the jury trying a capital case in which a conviction was had, were so exposed to intercourse with others as that they *might* have been subjected to corrupting or improper influences, that fact alone will nullify their verdict. The only safety for the purity and integrity of jury trials is in the absolute exclusion of all opportunity, during the trial, for the exertion of improper influences on the men composing the jury.

Error to the criminal court of Warren county.   OSGOOD, J.

The defendant, Robert Woods, was indicted by the grand jury, at the November term, 1869, of the criminal court of Warren county, for the murder of his wife, Amanda Woods; and at the following term in February, 1870, was tried and found guilty as charged in the indictment.   In the progress of the trial, the jury were permitted by the court, at three several times, at the request of the prisoner's counsel, to separate and disperse under instructions from the court; and, as appears by the affidavit of the deputy sheriff, were seen freely mingling and conversing with the people.   While the jury was being empaneled, Jacob Sanguinetti, summoned on the special *venire*, being sworn as to his qualifications as a juror, and being asked by the attorney for the state if he had any conscientious scruples in regard to the infliction of capital punishment, answered that "he had, and that those scruples might, or might not, influence his verdict; and that although, upon sufficient evidence, and under the instructions of the court, he would find a verdict of guilty, yet he had some conscientious scruples about inflicting capital punishment."   At the same time, Robert Henry, another juror, being sworn, answered in reply to the same questions, "that he had conscientious scruples about inflicting capital punishment; that he thought it a harsh way to administer the law."   The court discharged them as incompetent, and the prisoner excepted.

The evidence introduced by the state upon the trial, estab-

lished the following facts: About 8 or 9 o'clock on a Sunday morning, Amanda Woods, wife of the defendant, was sitting in the house of one Mitchell, having her hair combed, when the defendant came to the door where several other persons were sitting, to whom he spoke in a polite and civil manner, and then in the same way to his wife. That he seemed calm and peaceable, manifesting no intention to harm any one. After standing a few moments at the door, he entered the house where his wife was, and asked her if she was going to live with him any more; to which she replied, no. He said that was what he had been wanting to know for a long time, and almost immediately fired a pistol, shooting her in the back, inflicting a wound, from the effects of which she soon afterwards died. The prisoner then started out of the house and snapped the pistol at his own head twice, and at the third attempt fired, the ball entering behind the ear. After he had fallen to the ground, he was heard to say, "he wished he was dead, so that he could go along with his wife." One of the witnesses stated that she heard him say, "If she can't do me any good, she shan't do anybody else any good.".

On the part of the defense, but one witness was produced, Dr. Whitehead, who, as an expert, testified in substance as follows: "I am a physician by profession; have been practicing medicine about eleven years; the medical profession are much divided in opinion on the question of insanity in all cases of suicide; I think the majority of the profession believe that persons do sometimes commit suicide when not insane; but there is a large and respectable minority of the profession who believe that the act is never committed by a person except under the influence of mental disease."

*Booth, Young* and *Brien,* for plaintiff in error.

1st. In all capital cases the separation of the jury vitiates the verdict of guilty. 4 Sharswood's Blackstone, 359; Commonwealth v. Roby, 12 Pick., 496; Hare v. State, 4 How., 187; People v. Douglass, 4 Cow., 26; Brant v. Fowler, 7 ib., 762; Commonwealth v. McCall, 1 Va. Cases; McLean v. State, 10

Yerg., 24; Perkins v. Knight, 2 N. H., 474; McQuillen v. State, 8 S. & M., 587; Eastwood v. People, 3 Park., 25; McCann v. State, 9 S. & M., 465; Lewis v. State, 9 ib., 115; Boles v. State, 13 ib., 398; People v. Hartung, 4 Park., 265; Nelms v. State, 13 S. & M., 500; 4 How., 187; 10 Yerg., 141; Wesley v. State, 11 Humph., 502; Wiley v. State, 1 Swann, 256; 7 Cow., 562; 12 Pick., 496; 1 Va. Cases, 271; 13 Mass. R., 220; Pope & Jacobs v. State, 36 Miss., 121; Organ v. State, 26 Miss., 83; Caleb v. State, 39 Miss., 721.

2d. Although a juror may be opposed to capital punishment, if he can render a true verdict according to the evidence, he is impartial and competent. Boles v. State, 24 Miss., 445; Com. v. Webster, 5 Cushing, 295.

3d. That the prisoner in this case is entitled to the benefit of any doubt resting upon the question of sanity, and that the burden of proof, beyond a reasonable doubt, to establish defendant's capacity to commit the crime, is on the state. Dr. Ray, in his Medical Jurisprudence of Insanity, speaking of suicide, says: "To the healthy and well-balanced mind, suicide appears so strange and unaccountable a phenomenon, that many distinguished writers have regarded it as, in all cases, the effect of mental derangement, whilst by many others it has, with still less reason, been viewed as always the act of a sound, rational mind. Neither of these views can be supported by an impartial consideration of all the facts, and the truth probably lies between the two extremes." In the case of McCann v. Commonwealth, 16 N. Y., 58, it was held, that "If there be a doubt about the act of killing, all will concede that the prisoner is entitled to the benefit of it; and if there be any doubt about the will, the faculty of the prisoner to discern right and wrong, why should he be deprived of the benefit of it, when both the act and the will are necessary to make out the crime?" See also, Smith v. Commonwealth, 1 Duvall Ky. R.; Hopps v. People, 31 Ills.; Chase v. People, 40 ib.; Pope v. Slater, 12 Ind., 470; 1 Greenleaf on Ev., 95, Redfield's ed., note 81; Bennett & Heard's Lead. Cr. Cases, 87; Note to Commonwealth v. Rogers, 347.

*J. S. Morris,* attorney general, for the state.

1. The separation of the jury in a capital case, pending the trial, would be liable to exception if done without the consent of the prisoner; but in this case it was permitted by the court, not merely with the consent of the prisoner, but upon his voluntary motion. As to whether such consent cured the error, see Whar. Am. Crim. Law, § 591, 6th ed., and the numerous decisions there cited.

2. That the jurors named were properly challenged and stood aside because of conscientious scruples against capital punishment, see Whar. Am. Crim. Law, § 3020; Williams v. The State, 32 Miss., 389.

3. There is no proof of insanity in the prisoner except such suspicion as might arise from his attempt, or rather his *pretended* attempt, to take his own life. This is clearly insufficient, because, admitting the scientific proposition of insanity in all suicides, to have been doubtful before, that doubt was removed by the prisoner's own witness, Dr. Whitehead, who stated that this assumption is disputed by a majority of the medical profession, and by the weight of medical authority. Insanity, like that of any other abnormal fact, must not be presumed, but must be proved in all cases where it is relied on as an excuse for crime. Whar. Am. Crim. Law, 6th ed., 711, and the authorities there referred to. Comm. v. Rogers, 7 Metc., 500; 1 Bennett and H., L. C. C., 94, and note. Also, Bovard v. The State, 30 Miss, 600.

Peyton, C. J.:

In this case, the prisoner was indicted at the November term, 1869, of the criminal court of Warren county, for the murder of Amanda Woods, his wife, and at the ensuing February term of said court was found guilty by the jury.

A motion was made for a new trial and overruled, and sentence of death was pronounced upon him by the court, and from that judgment the prisoner prosecutes here this writ of error.

It appears from the record, that the prisoner having been arraigned at a former term of the court, was put upon his trial

at a subsequent term, on the 14th day of February, 1870; and the jury having heard part of the evidence, were on motion of the prisoner's counsel permitted to disperse and go at large, under the instructions of said court, until ten o'clock of the next morning. At that hour the jurors met the court, and the trial proceeded; and all the evidence given in the cause having been heard by the jury, they were, in the evening of that day, again permitted to disperse under the instructions of the court until ten o'clock the next morning, by the consent of the defendant's counsel and that of the prosecuting attorney.

It appears from the affidavit of Cooly Mann, the deputy sheriff, which was read upon the trial of the motion for a new trial, that on the morning after the first day's trial of the accused, he saw some of the members of the jury in the courthouse yard, talking and mingling with citizens, who were not members of that jury.

The main question presented by this record for our decision is, whether, for these separations of the jury, a new trial ought to be granted.

It is of the utmost importance to the administration of justice, that the purity of the trial by jury should be preserved. And time and experience have shown the wisdom of the common law, which forbids the separation of a jury in the trial of a capital case before they have been discharged of the prisoner, and an adherence to which, modified as it has been in some of its harsh features, by modern practice, is best calculated to effect that end. Departures from the common law rule in capital cases, should be as few as possible, and only allowed in extreme cases, and never for the comfort or convenience of the jurors. For, if this were allowed, it is not too much to say that few influential culprits would ever be convicted, and that few friendless ones, pursued by powerful persecutors, would escape conviction. Jurors are as open to prejudice from persuasion as other men; and neither convenience, comfort nor economy ought to be consulted, in order to guard against it. When selected to perform the important duties of jurors, they are withdrawn from the crowd, and must, necessarily, be subjected to some wholesome legal restraints for the purpose of guarding

them against improper influences, and to secure that confidence in the honesty and purity of their action, so essential to the administration of justice. Let them have every comfort compatible with their duties; but let them not be exposed to the influence of those who might pervert their judgment. The stream of criminal justice should be kept as pure as possible, and not be thus exposed to the chances of pollution from extraneous influences.

In the case of Hare v. The State, 4 How., 187, Chief Justice Sharkey, in delivering the very able and lucid opinion of the court in that case, says: "If the verdict be given under circumstances which might conduce to an improper influence, or the natural tendency of which might be to produce bias or corruption, it cannot then be said to be above suspicion; and if it be not, it must fall short of that perfection which the law requires, and which, under a more guarded administration, it is capable of producing. It is not necessary that an attempt should be made to bias the minds of the jurors, or that any pernicious influence should be exerted. The door to tampering is to be closed. This is the only security. For if it be left open, it may be predicted with certainty that the evil consequences will fall somewhere." If the purity of the verdict *might* have been affected, it must be set aside. A verdict on which doubts might rest, cannot be good. It must command entire confidence. And this is the doctrine of the cases of the Commonwealth v. McCaul, 1 Virginia Cases, 271; and McLean v. The State, 10 Yerger, 241. In neither of these cases of Hare, McCaul, and McLean, was any such thing as tampering with the jury shown; and the courts held that to be unnecessary, and say that it is sufficient that they *might* have been subject to improper influences. In order to maintain the purity and integrity of this species of trial, great care and precaution on the part of the courts should be observed to guard the jury against improper influences; and the more effectually to do this, we hold the only safe practice to be to regard the separation of the jury, even by the permission of the court, during the trial of a capital case, either with or without the consent of the prisoner, except in a case of great necessity, or the separation of any of

the jurors from their fellows during the progress of the trial, without being attended by a proper sworn officer, to be conclusive evidence of such an irregularity as will vitiate the verdict and render a new trial necessary.

In the case of Organ v. The State, 26 Miss., 83, the court say: "If any separation is to be allowed, without incurring the imputation of irregularity, for what length of time and for what purpose may it be? How frequently may it be practiced, and to what distance may it extend? By what means are communications between the jurors and other persons, which may take place, and which must necessarily be secret, to be disclosed?" These considerations show the dangerous uncertainties to which such a loose practice would lead, and the soundness of the rule above indicated, that every such separation should be considered as absolutely and conclusively vitiating the verdict. The doctrine that in such cases the verdict would only be *prima facie* vicious, and open to explanation, would lead to an inquiry as to the effect of the communications between the jurors and other persons, which would necessarily imply a sort of impeachment of their conduct, from which they would naturally endeavor to exculpate themselves, by attempting to show that those communications had no influence in procuring the verdict. The statements of the juror, who would so far disregard the obligations of his oath, and the duties which, as a citizen, he owes to the community in which he lives, as to permit himself to be tampered with, and of the person who is capable of tampering with him, must be received with many grains of allowance, and are not entitled to full faith and credit. No person can know what the communications were but the parties themselves between whom they are made; and a judicial investigation into those communications, which are of themselves a violation of law, would inspire a desire not only to avoid their penal consequences, but to maintain the character of good citizens, by making it appear that they had no improper influence upon the mind of the juror in the trial of the case. Testimony derived from such contaminated sources would be entitled to but little credence, and certainly could not form a reliable basis for the intelligent action of a court in a case involving the momentous

issues of life and death. The great difficulty in determining what communications were made, and what effect they may have had upon the minds of the jurors, is sufficient, in our opinion, to condemn the practice.

And we think that the purity and integrity of this mode of trial can be preserved only by a close adherence to the common law rule, which requires that the jury shall be kept together, and not allowed to separate from their fellows without being attended by the bailiff or officer having them in charge until the case is tried or otherwise disposed of, and they are regularly discharged by the court. By permitting the jury to go at large, as in the case now under consideration, they were liable to be tampered with and to imbibe prejudices against the accused. It is immaterial whether improper influences have been exerted or not; the only safety is in keeping the jury free from the liability to such influences. McQuillen v. The State, 8 S. & M., 596. The door to tampering must be closed, and the only effectual way to do it is to set aside verdicts when found under the circumstances above indicated.

But in all other cases of irregularity, in which it may be made to appear that the jury, during the trial, have been exposed to improper influence which *might* have affected the purity of their verdict, such exposure shall vitiate the verdict, unless it affirmatively appear that such influence failed to have any effect in procuring it.

In this case it is suggested by the counsel for the state that if there was any error in permitting the jury to separate, it was cured by the consent of the prisoner. We do not agree with counsel in this view of the law. We are of opinion that the court has no power to authorize the separation of the jury during the trial of a capital case, either with or without the consent of the prisoner, except in cases of great necessity; and if it be done, and the prisoner be found guilty, a new trial will be granted. The prisoner ought not to be asked to consent. Who dare refuse to consent, when the accommodation of those in whose hands are the issues of his life or death is involved in the question? He would have to calculate the chances of irritation from being annoyed by a refusal on the one hand, and of

tampering on the other. No consent of the prisoner, in the extremity of his need, ought to bind him. He may really be unwilling to permit the jury to separate, but may consent for fear that his refusal may prejudice the jury against him. Peiffer v. The Commonwealth, 15 Penn. State Rep., 468; The State v. Hornsby, 8 Rob., 554; The State v. Populus, 12 La. Ann. Rep., 710; The Commonwealth v. McCaul, 1 Virginia Cases, 271; Westley v. The State, 11 Humphrey, 502; Wiley v. The State, 1 Swann, 256; People v. Backus, 5 California, 272.*

For these reasons the judgment must be reversed, and the case remanded for a new trial.

Judge SIMRALL not sitting in this case.