421 So.2d 1009 (1982)
Mack Arthur KING
v.
STATE of Mississippi.
No. 53027.
Supreme Court of Mississippi.
October 27, 1982.
Rehearing Denied December 1, 1982.
*1010 Joe O. Sams, Jr., Thomas L. Kesler, Columbus, for appellant.
Bill Allain, Atty. Gen. by Carolyn B. Mills, Sp. Asst. Atty. Gen., Jackson, John M. Montgomery, Dist. Atty., Starkville, for appellee.
En Banc.
SUGG, Presiding Justice, for the Court on Parts I and II.
About 10:30 a.m. on August 3, 1980 Mrs. Lelia Patterson was found dead in a bathtub in her home. An investigation revealed that the screen on a door had been cut, the telephone wires outside the house had been severed, articles were scattered throughout the house, and dresser drawers had been emptied on the floor. A fingerprint and palmprint were found on two file folders in a box located in the house. The prints matched known fingerprints and palmprints of appellant. Appellant's residence was searched two days later and several items which belonged to Mrs. Patterson were found. Appellant was arrested on August 6th and denied that he had been at Mrs. Patterson's house on August 3rd. The officers interviewed appellant's girlfriend, Barbara Jordan and on the basis of information received from her, appellant's residence was searched a second time and additional items from Mrs. Patterson's home were found.
*1011 Appellant was questioned after the second search and admitted that he entered the house of Mrs. Patterson on Saturday night, August 2nd, burglarized the house, saw Mrs. Patterson, but did not kill her. In his second statement he said he was accompanied by Willie Porter who remained outside while appellant burglarized the house, that Mrs. Patterson was alive when he left the house, and that Willie Porter entered the house as he was leaving. Appellant also said he saw Willie later in the morning of August 3rd and Willie told him that he, Willie, had taken some articles from Mrs. Patterson's house.
After signing the second statement, appellant agreed to another search of his premises and told the officers where to find additional items stolen from Mrs. Patterson which were hidden near his house.
According to Barbara Jordan, appellant showed her some of the articles he had stolen but did not tell her where they came from. She testified that appellant was wearing green pants on Saturday, August 2nd and Sunday, August 3rd which were confiscated by the police. On Tuesday appellant washed the pants after refusing to let the witness wash them as was customary. Human blood was found on the pants but not in a sufficient amount to ascertain the blood type.
The pathologist who performed the autopsy on Mrs. Patterson's body testified that she had multiple bruises about her neck, face, and arms, a laceration on the back of her head, and water in her lungs. In the opinion of the pathologist Mrs. Patterson had been manually strangled, struck on the back of the head with such force that it caused edema of the brain, and had been under water while she was either conscious or unconscious. He was unable to ascertain the order in which the events occurred, but stated if the manual strangulation took place first, then the victim could have regained consciousness, but if the trauma to the skull occurred first, she possibly never regained consciousness. Mrs. Patterson's death could be attributed to either strangulation, a blow to the head, or drowning. The findings of the pathologist show conclusively that Mrs. Patterson was brutally murdered.

I.
Appellant does not question the sufficiency of the evidence in his four assigned errors. The first two assignments of error will be discussed together because the proof and argument pertaining to them are interrelated. The first two assignments of error are as follows:
The lower court erred when the juror Mary Castlebury Holley was separated from the rest of the jury panel and subsequently allowed to return to the jury room following voir dire by both the State's attorney and the attorney for the defendant.
The lower court erred in overruling the defendant's motion to excuse the juror Mary Castlebury Holley after voir dire examination revealed that she had failed to disclose certain facts to the defendant on voir dire examination. The failure of the juror to disclose this certain information and the trial court's overruling the motion to excuse the juror from the panel denied the defendant due process of law as he was not allowed to exercise his peremptory challenges by the process and manner dictated by law.
On the second day of the trial one of the court-appointed attorneys for appellant made a motion to excuse Mrs. Holley and replace her with an alternate juror because she was the former wife of Jimmy Covington, a deputy sheriff of Lowndes County and because the juror's father, Elton Castlebury, was a defendant in a lawsuit filed by G.B. Green, Sr. then pending in the Supreme Court of the State of Mississippi and that Green was represented by one of appellant's attorneys. However, a check of the docket shows that no case involving Castlebury and Green has been filed in this Court.
The State called Jimmy Covington who testified that he was the former husband of Mrs. Holley, two children were born to their marriage, and they had been divorced for *1012 five years. During his marriage to Mrs. Holley, Covington was a member of the sheriff's mounted patrol but was not a deputy sheriff. At the time of the trial, Covington was a deputy sheriff in charge of civil process and also acted as a bailiff for the courts. Covington was one of the bailiffs who took the jury to supper the night before. On cross-examination he stated that he was not a sworn deputy while a member of the mounted patrol, but the patrol would be called out when, "someone was lost or something." He testified that he knew G.B. Green, Sr. was a neighbor of his former wife's father, Elton Castlebury, and three weeks before appellant's trial he had been told by appellant's counsel of the lawsuit between Green and Castlebury, but he thought the lawsuit had been concluded.
After both sides rested trial judge permitted defense counsel to question Mrs. Holley. She first said that while she was married to Jimmy Covington he was not a member of the sheriff's mounted patrol but later admitted he may have been a member of the sheriff's posse. Additional testimony was elicited from the witness as follows:
Do you recall the question yesterday about whether you were related by blood or marriage now or in the past to any member of law enforcement; did you understand that that could have included this particular individual?
A. No, I did not.
Q. You do acknowledge that you did not raise your hand at that time; you do acknowledge that you didn't raise your hand?
A. I don't recall the question that 
Q. You don't recall the question; All right, Mrs. Holley, who's your dad, I may have asked you?
A. Elton Castlebury.
Q. And, Mrs. Holley, do you know a one, G.B. Green, Sr.?
A. Yes.
Q. Is he a next door neighbor of your dad's?
A. Yes.
Q. Is there current litigation going on between them over a pond in the Supreme Court of the State of Mississippi?
A. Not that I know of.
MR. SAMS:
I've got no further questions of this witness.
QUESTIONING BY MR. HOWARD:
Q. Did you know that Joe Sams, Jr., the lawyer that just questioned you, represented Mr. Green at all against your father?
A. No, I didn't.
Q. And that would have been the reason you didn't respond when Mr. Sams asked you yesterday if any  if he represented anybody in lawsuits against you or any other members of the jury or their families?
A. Yes, sir. Can I say something?
Q. Sure.
A. I  the  the last that  the last time that Mr. Green sued my father I thought it was Mr. Burgin.
Q. You didn't know anything about Joe Sams being involved, did you?
... .
Q. Then you don't even remember Mr. Sams even asking a question about being related to members of law enforcement, do you?
A. No.
Q. If 
A. I  I remember him asking if you were related to someone who is in law enforcement.
Q. But you are not related to anyone that's in law enforcement, is that correct?
A. No.
Q. Even if you were would that have influenced your verdict in this case?
A. No.
Q. Would you base your verdict solely on the evidence and the testimony that you've heard in the last two days?
A. Yes, sir.
Q. Do you feel that you could be fair and impartial to the State of Mississippi and to Mack Arthur King in this case?
A. Yes, sir.
Q. And base your verdict on the evidence?

*1013 A. Yes.
MR. HOWARD:
Nothing further, Judge.
QUESTIONING BY COURT:
Q. Mrs. Holley, apparently now it's come out that Mr. Sams does represent Mr. Green against your father, would that influence you in any way in the trial of this case, if that were true?
A. No, sir.
Q. And while you were married to Mr. Covington, as far as you know he was not involved in law enforcement?
A. He may have been a member of the sheriff's posse; other than that, no.
Q. Would that  even if he had been a member of the sheriff's posse, would that influence you in any way?
A. No, sir.
Q. Do you have any particular feelings for Mr. Covington now that would influence you in any way?
A. No, sir.
... .
THE COURT:
All right, you may return to the jury room.
MR. SAMS:
Your Honor, we're going to specifically at this time object to the  the juror being allowed to return. Now, that she's been advised that I've got a lawsuit against her Dad because this is a capital murder case, and for her to return now, you know, fresh with the knowledge that I'm involved against her father I think would be extremely detrimental and harmful to the interest of the defendant.
THE COURT:
I believe she's testified under oath that this would not affect her in any manner.
MR. SAMS:
Well, we think that  we think that  that though she speaks with complete candor and honesty, I'm sure, that the subconscious knowledge that I've got an ongoing litigation against her own father has got to have some effect, and this is, of course, a court appointed case, and it's a capital case, and I'm very concerned about it.
THE COURT: What does the State feel?
MR. HOWARD:
Your Honor, this juror answered the questions that she would be fair to both parties, and that's all the State ever wants is a fair juror, and she said that she would be fair, and that's what we want. I believe this lawsuit thing is in the Supreme Court; it's not a  it's a paper lawsuit now, your Honor, and not  not any Circuit Court litigation or any witnesses involved, your Honor.
THE COURT:
All right, the motion will be overruled. You may return to the jury room, Mrs. Holley.
(JUROR RETURNS TO JURY ROOM)
Appellant first argues that the separation of Mrs. Holley from the other jurors vitiated the verdict of the jury.
This argument is based on Woods v. State, 43 Miss. 364 (1870) in which this Court followed the common law rule that a defendant on trial in a capital case was entitled to have the jury sequestered, from oath to discharge. In Woods, the jury, after having heard part of the evidence, was permitted to disburse and go at large on motion of appellant's counsel until 10:00 o'clock the next morning. We reversed and stated:
"If the verdict be given under circumstances which might conduce to an improper influence, or the natural tendency of which might be to produce bias or corruption, it cannot then be said to be above suspicion; and if it be not, it must fall short of that perfection which the law requires, and which, under a more guarded administration, it is capable of producing. It is not necessary that an attempt should be made to bias the minds of the jurors, or that any pernicious influence should be exerted. The door to tampering is to be closed. This is the only security. For if it be left open, it may be predicted with certainty, that the evil consequences will fall somewhere." If the purity of the verdict might have been affected, it must be set aside. A verdict *1014 on which doubts might rest, cannot be good. It must command entire confidence. And this is the doctrine of the cases of the Commonwealth v. McCaul, 1 Virginia Cases, 271; and McLain v. the State, 10 Yerger, 241. In neither of these cases of Hare, McCaul, and McLean, was any such thing as tampering with the jury shown, and the courts held that to be unnecessary, and say that it is sufficient that they might have been subject to improper influences. In order to maintain the purity and integrity of this species of trial, great care and precaution on the part of the courts should be observed to guard the jury against improper influences; and the more effectually to do this, we hold the only safe practice to be to regard the separation of the jury, even by the permission of the court, during the trial of a capital case, either with or without the consent of the prisoner, except in a case of great necessity, or the separation of any of the jurors from their fellows during the progress of the trial, without being attended by a proper sworn officer, to be conclusive evidence of such an irregularity as will vitiate the verdict and render a new trial necessary. (43 Miss. at 370) (emphasis added.)
In Lampley v. State, 291 So.2d 707 (Miss. 1974), two jurors were inadvertently separated from the others for about fifteen or twenty minutes. We held that the separation did not vitiate the verdict of the jury. In Lampley, we stated that the strong language of Woods was and is sound law, "although the language of the opinion is inappropriate to an inadvertent separation for a brief time such as that involved in the present case." We stated further:
In Skates v. State, 64 Miss. 644, 1 So. 843 (1887), the jurors were allowed to go to a privy while the officer in charge was some seventy-five yards away and out of sight of the jurors. There was no showing that any other persons talked to the jurors, but since the privy was a public one, other persons might have been in the privy with the jurors. In rejecting the contention that the separation of the jury vitiated the verdict, the Court in Skates said:
"There are to be found many expressions in our reported cases to the effect that where circumstances were shown which exposed the jury to the possibility of being tampered with, the verdict must be set aside unless it is affirmatively made to appear that no improper influences were brought to bear upon it. But this language must be interpreted by the circumstances of the case in which it was used... .
In all these cases the verdicts were set aside, and new trials awarded. It will be noted that in all of them it was either shown that other persons had been brought in contact with the jury, or that there was a separation of the jury under such circumstances as to afford a reasonable presumption that communication was had with others; there was in each case something more than a remote possibility that such communication was had, though in many of the cases observations are made by the court indicating that any separation of one juror from his fellows would be sufficient to annul the verdict unless it was affirmatively shown that no communication was had with others.
We find no fault with the result reached in either of the cases cited, but we do not concur in the language used in some of them from which the conclusion is sought to be drawn, and reasonably, that the mere withdrawal of a juror from the sight of his fellows and of the officer is under any and all circumstances a separation of the jury. Whether it is or is not must, as it seems to us, be dependent upon the circumstances of each particular case. Judges and jurors are but men, and we know of no reason why, in dealing with the action of jurors, any impracticable and unapproachable standard shall be adopted by courts to measure their conduct,  a standard which, if applied to the judges of the courts, would produce frequent miscarriages of justice. If the mere possibility of unlawful communication *1015 or influence is sufficient to annul a verdict, when shall one be said to be pure and free from suspicion? All our court-houses are in public places, and the public have right of access to them. At sessions of court many persons are there congregated, either from curiosity or by reasons of business for themselves or others. Jury-rooms open into the court-rooms, frequently filled with spectators, or by windows overlook the yards. Communication by writing, by signs, and by words is always possible, but it would be destructive to the ends of justice to hold that such possibility as this of unlawful influence should avoid verdicts upon which no just suspicion rests. To this all must agree. 64 Miss. at 651, 653, 1 So. at 845, 847."
In Haley v. State, 123 Miss. 87, 85 So. 129, 10 A.L.R. 462 (1920), the separation was brought about by a juror's illness and the Court reaffirmed the language in Skates, and added that "the true test there [in Skates] indicated is whether the judicial mind would conclude that unlawful influence has been exerted." 123 Miss. at 109, 85 So. at 133, 10 A.L.R. at 469.
(291 So.2d at 709)
In this case Mrs. Holley was brought from the jury room to the courtroom for examination. The separation was necessitated by the fact that appellant's counsel desired to question the juror in an attempt to show that she should be replaced with an alternate juror. The separation of the juror was necessary to permit the appellant to attempt to show bias or prejudice on the part of the juror without exposing the remaining jurors to the questions which might be asked. Woods does not hold that every separation of a juror would vitiate the verdict of the jury, but recognizes that if a separation is required in a case of great necessity or if the juror is attended by a properly sworn officer, the jury verdict is not vitiated by such separation. The separation of Mrs. Holley from the other jurors was not under circumstances "as to afford a reasonable presumption that communication was had with others." The trial judge did not err by permitting the juror to be separated from the other jurors to permit appellant's counsel to question her in the presence of the court.
Appellant also argues that Mrs. Holley should have been replaced with an alternate juror because she had formerly been married to a man who was now a deputy sheriff. Her ex-husband was not a deputy sheriff while they were married and his only association with the sheriff was as a member of the mounted patrol. In the words of the ex-husband the mounted patrol would only be called out when "someone was lost or something." Mrs. Holley was not disqualified because her ex-husband, following the divorce, was a deputy sheriff, and during their marriage was a member of the sheriff's mounted patrol.
Appellant also contends that Mrs. Holley should have been replaced with an alternate juror because of the litigation existing between her father and one Castlebury, who was represented by one of appellant's court-appointed attorneys. Mrs. Holley's knowledge of the litigation between her father and Castlebury was not fully developed and she testified that she thought Castlebury was represented by another attorney. The attorney represented that the case was then pending on appeal in the Supreme Court, but this Court's records do not show that the case was then pending or is now pending.
Appellant relies on Atkinson v. State, 371 So.2d 869 (Miss. 1979); Brooks v. State, 360 So.2d 704 (Miss. 1978); Dase v. State, 356 So.2d 1179 (Miss. 1978) and Odom v. State, 355 So.2d 1381 (Miss. 1978), as authorities sustaining his argument that Mrs. Holley should have been dismissed from the jury. Appellant's reliance on these cases is misplaced because all of these cases involve the discovery, after trial, that a prospective juror failed to respond to a relevant and direct question concerning facts within the juror's knowledge which had a bearing on the juror's competence to serve. In these cases the nondisclosure by the juror of relevant information occurred after trial and there *1016 was no opportunity to question the juror during trial to determine if the juror, despite the relevant facts, would be fair and impartial.
Appellant's counsel was afforded the opportunity to examine the juror who stated unequivocally that she would base her verdict solely on the evidence that she had heard in the two days of the trial and that she could be fair and impartial to the state and to appellant.
It is familiar law that it is the duty of the court to see that a competent, fair, and impartial jury is empanelled. McCarty v. State, 26 Miss. (4 Cushm.) 299, 1 Mor.St.Cas. 705 (1853), and the question of whether a juror is fair and impartial, is a judicial question, and the judgment of the trial court will not be disturbed unless it clearly appears that it is wrong. Odom v. State, supra.
Although there is no showing in the record that the litigation between Mrs. Holley's father and Castlebury was in progress at the time of the trial and although alternate jurors were available, we will not disturb the trial court's holding that Mrs. Holley was a fair and impartial juror because it does not appear that the trial court was wrong.
On Part 1  all Justices concur, except PRATHER, J., who takes no part.

II.
Appellant argues that the trial court erred in refusing Instruction D-12 which follows:
The Court instructs the jury that, where there are two reasonable hypotheses arising out of and supported by the evidence, it is the duty of the jury to adopt the hypothesis consistent with innocence, even though the hypothesis of guilt be the more probable.
This argument is without merit because Instruction S-2A adequately instructed the jury on the State's burden of proof under the facts of the case. S-2A provides in part:
If you believe from the evidence in this case beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that... Mack Arthur King ... did ... kill and murder Lela Patterson ... while ... engaged in the commission of the crime of burglary, or in any attempt to commit burglary ...
Appellant did not testify and his only defense was contained in a statement he made to the officers. He told the officers that when he left Mrs. Patterson's house, she was still alive, and that Willie Porter entered the house as he was leaving, and Porter later told appellant he had taken some property from Mrs. Patterson's house. This is the only hypothesis advanced by appellant consistent with his innocence.
To the contrary, a picture of Mrs. Patterson's body in the bathtub shows a considerable amount of blood in the bathtub, a white cloth found near the bathtub had blood type O on it, two other pictures show a red stain on a pillowcase on a bed, there was human blood on the trousers appellant was wearing during the burglary, human blood was found on a box that appellant had taken in the burglary and hidden beside appellant's home, and appellant had attempted to wash the blood out of his trousers. The pathologist testified that there was a laceration on the head which extended down to the bone of the skull and that bloody froth was flowing freely from the nose and mouth of the victim. This evidence was consistent with the State's theory that appellant was the person who administered the blow to the head of the victim.
We hold that Instruction S-2A was proper, and adequately informed the jury of the law as applied to the facts in this case. It was not error for the court to refuse Instruction D-12.
On Part II  all Justices Concur, except PRATHER, J., who takes no part.
WALKER, Presiding Justice, for the Court:

III.
Appellant's third assignment of error is that the court erred when it refused to *1017 allow defendant to amend Instruction D-7. Before the second phase of the trial, appellant submitted defendant's Instruction 7 which was accepted by the court. The instruction follows:
You have found the Defendant guilty of the crime of capital Murder. You must now decide whether the Defendant will be sentenced to death or to life imprisonment. In reaching your decision, you must objectively consider the detailed circumstances of the offense for which the Defendant was convicted, and the character and record of the Defendant himself.
To return the death penalty you must find that any aggravating circumstances  those which tend to warrant the death penalty  outweigh the mitigating circumstances  those which tend to warrant the less severe penalty.
Consider only the following elements of aggravation in determining whether the death penalty should be imposed:
1) The Capital Murder was committed while the Defendant was engaged in the commission of the crime of burglary or in an attempt to commit a burglary.
2) The Defendant committed the Capital Murder in an especially heinous, atrocious, and cruel manner.
You must unanimously find, beyond a reasonable doubt, that one or more of the above aggravating circumstance(s) exist in this case to return the death penalty. If none of the elements are found to exist, the death penalty may not be imposed, and you shall write the following verdict on a sheet of paper:
"We, the jury, find that the Defendant shall be sentenced to life imprisonment."
If one or more of these elements of aggravation listed above is found to exist, then you must consider whether there are mitigating circumstances which outweigh the aggravating circumstance(s). Consider the following elements of mitigation in determining whether the death penalty should not be imposed.
1) All factors and circumstances surrounding the alleged crime,
or
2) The age of the Defendant,
or
3) The background of the Defendant,
or
4) Any other facts or circumstances that you consider relative or probative or act in mitigation.
Any other matter, and any other aspect of the Defendant's character and record, and any other circumstance of the offense brought before you during the trial of this case which you, the jury, determine to be mitigating on behalf of the Defendant.
If you find from the evidence that one or more of the preceding elements of mitigation exist, then you must consider whether it or they outweighs or overcomes the aggravating circumstance(s) you previously found, and you must return one of the following verdicts:
1) "We, the jury, unanimously find that the aggravating circumstance(s) or: (itemize and write out all of the aggravating circumstance(s) presented in this instruction which you unanimously agree exist in this case beyond a reasonable doubt).
_____________________________________________________ _____________________________________________________ _____________________________________________________
are sufficient to impose the death penalty and there are insufficient mitigating circumstance(s) to outweigh the aggravating circumstance(s)... ."
If you find that mitigating circumstance(s) outweigh the aggravating circumstance(s) and agree to the sentence of life imprisonment, the form of your verdict should be as follows:
2) "We, the jury, find that the Defendant should be sentenced to life imprisonment."
If you find that the mitigating circumstance(s) outweigh the aggravating circumstance(s) and are unable to agree to the sentence of life imprisonment, the form your verdict should be as follows:

*1018 3) "We, the jury, have been unable to unanimously agree on punishment."
After argument the jury returned the following verdict:
"We, the jury, unanimously find that the aggravating circumstances
1) The Capital Murder was committed while the Defendant was engaged in the commission of the crime of burglary or in an attempt to commit a burglary.
2) The Defendant committed the capital murder in an especially heinous, atrocious and cruel manner."
are sufficient to impose the death penalty and there are insufficient mitigating circumstances to outweigh the aggravating circumstances.
Thereafter, before the case was submitted to the jury at the sentencing phase, appellant's counsel made a motion to add to Instruction D-7 the following language:
If you are unable to unanimously agree on which circumstances outweigh the other, and arrive at a verdict fixing the punishment, then the form of your verdict should be as follows:
"We, the jury are unable to unanimously agree upon the punishment to be inflicted."
The motion to amend was overruled by the trial judge who stated that Instruction D-7 adequately informed the jury of the verdicts it might return.
We are of the opinion that no error was committed in refusing the appellant's requested amendment to his instruction.
First, the instruction, as given, informed the jurors that before they could sentence appellant to death, they must unanimously find one or more aggravating circumstance from the evidence beyond a reasonable doubt, and must further find there were insufficient mitigating circumstances to outweigh the aggravating circumstances. After being so instructed, the jury returned the following unanimous verdict:
We, the jury, unanimously find that the aggravating circumstances
1) The Capital Murder was committed while the Defendant was engaged in the commission of the crime of burglary or in an attempt to commit a burglary.
2) The Defendant committed the capital murder in an especially heinous, atrocious and cruel manner.
are sufficient to impose the death penalty and there are insufficient mitigating circumstances to outweigh the aggravating circumstances.
There was no indication in the record that they had any difficulty reaching an agreement.
Secondly, the defendant's argument that the jury was not fully instructed overlooks the statutory duty imposed on the court by Mississippi Code Annotated section 99-19-103 (Supp. 1981)[1] for the court to dismiss the jury after a reasonable period of deliberation and impose a life sentence on the defendant.
The argument creates an illusion of prejudice, which has no logical basis. If the jurors were unable to unanimously find that the aggravating circumstances were sufficient to impose the death penalty and that there were insufficient mitigating circumstances to outweigh the aggravating circumstances, then they could not return a death sentence. Further, in the event they could not unanimously agree after a reasonable period of deliberation, it would be the trial judge's duty under Mississippi Code Annotated section 99-19-103 to dismiss the jury and impose a sentence of life imprisonment on the defendant.
We have carefully considered the court's instructions in this case and are of the opinion that they fully instructed the jury on the applicable law.
We are also mindful of the recent decision in Jordan v. Watkins, 681 F.2d 1067 (5th Cir., 1982), and are of the opinion that the sentencing phase instructions were so *1019 worded that the jury's discretion was suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action and channeled the jury's discretion by clear and objective standards providing specific and detailed guidance which make rationally reviewable the process for imposing a sentence of death. See Godfrey v. Georgia, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764-65, 64 L.Ed.2d 398, 406 (1980).
We have meticulously reviewed the record and compared it with all of our decisions subsequent to Jackson v. State, 337 So.2d 1242 (Miss. 1976)[2] involving the death penalty. Some have been affirmed and some reversed. After such comparison, we conclude that the death penalty here is not excessive in the light of the aggravating and mitigating circumstances. We further find that the infliction of the death penalty on Mack Arthur King is not disproportionate, wanton or freakish when compared to cases involving similar crimes, the facts surrounding them and the defendants.
We also find that the sentence of death was not imposed under the influence of passion, prejudice or any other arbitrary factors, and, that the evidence overwhelmingly supports the jury's finding of statutory circumstances in that the capital murder was committed while the defendant was engaged in the commission of the crime of burglary or in an attempt to commit a burglary, and that the defendant committed the capital murder in an especially heinous, atrocious and cruel manner. The execution of King will be consistent and evenhanded in the light of all post Jackson death penalty cases considered by this Court.
The judgment of the lower court is affirmed and Wednesday, December 8, 1982, is set as the date for execution of the sentence and infliction of the death penalty in the manner provided by law.
On Part III  WALKER, P.J., and BROOM, ROY NOBLE LEE, BOWLING and DAN M. LEE, JJ., concur.
PATTERSON, C.J., SUGG, P.J., and HAWKINS, J., dissent.
PRATHER, J., takes no part.
AFFIRMED AS TO GUILT PHASE; AFFIRMED AS TO SENTENCING PHASE AND WEDNESDAY, DECEMBER 8, 1982, IS SET AS THE DATE FOR EXECUTION OF THE SENTENCE AND INFLICTION OF THE DEATH PENALTY IN THE MANNER PROVIDED BY LAW.

APPENDIX "A"
DEATH CASES AFFIRMED BY THIS COURT:

Willie Albert Smith v. State, 419 So.2d 563, handed down 1982, and not yet reported.

Edwards v. State, 413 So.2d 1007 (Miss. 1982).

Johnson v. State, 416 So.2d 383 (Miss. 1982)

Bullock v. State, 391 So.2d 601 (Miss. 1980)

Reddix v. State, 381 So.2d 999 (Miss. 1980)

Jones v. State, 381 So.2d 983 (Miss. 1980).

Culberson v. State, 379 So.2d 499 (Miss. 1979)

Gray v. State, 375 So.2d 994 (Miss. 1979)

Jordan v. State, 365 So.2d 1198 (Miss. 1978)

Voyles v. State, 362 So.2d 1236 (Miss. 1978)

Irving v. State, 361 So.2d 1360 (Miss. 1978)

Washington v. State, 361 So.2d 61 (Miss. 1978)

Bell v. State, 360 So.2d 1206 (Miss. 1978).
DEATH CASE REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT.
Coleman v. State, 378 So.2d 640 (Miss. 1979)
SUGG, Presiding Justice, dissenting in Part III.
I dissent from the holding of the majority in Part III for the reasons stated hereafter.
*1020 Before the case was submitted to the jury at the sentencing phase, appellant's counsel moved to add to the instruction the following language:
If you are unable to unanimously agree on which circumstances outweigh the other, and arrive at a verdict fixing punishment, then the form of your verdict should be as follows:
We, the jury, are unable to unanimously agree upon the punishment to be inflicted.
The motion to amend was overruled by the trial judge because he was of the opinion that Instruction D-7 adequately informed the jury of the verdicts it might return. Instruction D-7 is the same as State's Instruction S-7, which was withdrawn, except it includes four mitigating factors which might be considered by the jury.
By way of summary, D-7 instructed the Jury:
(1) Before the jury could return the death penalty, it must unanimously find one or more aggravating circumstances which outweigh the mitigating circumstances.
(2) If no aggravating circumstances were found, the death penalty might not be imposed and the jury should sentence the defendant to life imprisonment.
(3) If the jury found that mitigating circumstances outweighed aggravating circumstances, and agreed to the sentence of life imprisonment, the jury should sentence the defendant to life imprisonment.
(4) If the jury found the mitigating circumstances outweighed the aggravating circumstances but were unable to agree on the sentence of life imprisonment, the form of the verdict should be, "We, the jury, have been unable to unanimously agree on punishment."
Although the instruction as given informed the jury that before it could sentence appellant to death, it must unanimously find one or more aggravating circumstances from the evidence beyond a reasonable doubt, and must further find there were insufficient mitigating circumstances to outweigh the aggravating circumstances, it was not instructed as to the verdict it could return if unable to unanimously agree on which circumstances outweighed the other.
The requested amendment would have cured this deficiency and should have been granted. In Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) the Court stated that a state must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance. Instruction D-7 without the requested amendment simply did not tell the jury what verdict it could return if the jurors were unable to unanimously agree on which circumstances outweighed the other. I would remand for resentencing under a proper instruction.
PATTERSON, C.J., and HAWKINS, J., join in this dissent.
HAWKINS, Justice, dissenting:
I concur with Justice Sugg that the instruction was defective, that the trial court was in error in refusing to grant the amendment requested by defense counsel, and that this case should be remanded for hearing before another jury to determine the issue whether the defendant should receive the death penalty or life imprisonment.
In my view the instruction contains an additional defect.
While Miss. Code Ann. § 99-19-101 (Supp. 1981) sets forth objective guidelines to be considered by the jury before they will be authorized to inflict the death penalty, I see no legislative intent that upon finding such conditions to exist the jury in some way is obligated to inflict the death penalty. In my view the sentencing jury should be instructed that after considering the aggravating and mitigating circumstances, if they wish to sentence the defendant to life imprisonment they have the right to do so.
The model instruction heretofore approved by this Court, and the instruction which essentially was granted by the circuit judge in this case, does not clearly give the *1021 jury this initial discretion, after examination of the evidence, to sentence the accused to life imprisonment, regardless of whether there are aggravating circumstances and no mitigating circumstances, or whether the aggravating circumstances outweigh the mitigating circumstances.
I believe the sentencing jury should have the prerogative, spelled out in the instruction, that regardless of the proof, it is nevertheless in their discretion, if they choose, to sentence the accused to life imprisonment.
This has been our concept of the function of the jury in death penalty cases for over a century. I see no U.S. Supreme Court authority which changes this salutary concept. Nor does § 99-19-101, to my mind, suggest the contrary.
On this point, Spain v. State, 59 Miss. 19 (1881), provides an interesting corollary. In 1872, the Legislature passed an act providing that conscientious scruples against the infliction of the death penalty would not disqualify a person from being a juror in a capital murder case. In 1875, the Legislature repealed the 1872 act, but the right of the jury to fix the punishment at imprisonment for life was declared. Following trial, Spain's jury found him guilty but recommended mercy. According to the opinion, the following transpired:
... the court ordered the jury to be conducted back to their room, apprising them that they would find a form for their verdict in the second charge for the State. This instruction is that, if the jury simply find the accused guilty as charged in the indictment, it will be the duty of the court to pronounce the death penalty; but, if the evidence in the case warrants them in so doing, they may find him guilty as charged, "and declare that the punishment to be inflicted shall be imprisonment in the penitentiary for life," or they may find the defendant not guilty. Afterwards the jury rendered a verdict of guilty as charged, and the appellant was sentenced to be hanged.
Id. at 19-20.
The instruction was condemned because it "... made the right of the jury to fix the punishment to depend on its view that the evidence warranted it, ..." Id. at 25. We said:
The judgment must be reversed, because of the second instruction given at the instance of the State. It limits and qualifies the right of the jury to fix the punishment at imprisonment for life, whereas the law confers on the jury this right without qualification or restriction. The right of the jury to fix the punishment as indicated is without any condition. The most atrocious crime committed under the most aggravating circumstances may be punished by imprisonment for life, instead of by death, if the jury so determines by its verdict. The law demands a jury willing to be the instrument of visiting the penalty of death, and confers on such a jury the unconditional right to fix the punishment at imprisonment for life. It was erroneous to instruct the jury that its right was dependent on any state of the evidence or on any view it might take of it.
Id. at 24.
I do not contend that the model instruction contains the blatant error as was in the instruction condemned in Spain. I concede it may be argued, and perhaps with some persuasion, that the model instruction gives the jury the unconditional right to sentence the accused to life imprisonment regardless of the evidence. This right of the jury, however, is not clearly and affirmatively set out therein, in my view.
As we said in Spain, the law demands a jury willing to be the instrument visiting the penalty of death, but also confers on such jury the unconditional right to fix the punishment at life imprisonment. This right vested in the trial jury should be clearly spelled out by court instruction.
Attached as an appendix is a proposed instruction which incorporates my view and the view of Justice Sugg.

APPENDIX

CAPITAL MURDER SENTENCING PHASE
The defendant has been found guilty of the crime of capital murder. You must *1022 now decide whether the defendant will be sentenced to death or to life imprisonment. In reaching your decision you should consider the detailed circumstances of the offense for which the defendant was convicted, and the defendant himself.
The ultimate determination of whether the defendant shall suffer death or life imprisonment is for you and you alone to decide. The instructions given here, however, must be followed before you are authorized to inflict the death penalty.
You must first deliberate and find from the evidence beyond a reasonable doubt whether any one or more of the following aggravating circumstances exist in this case:

(List aggravating circumstances)
If you are not unanimous in your agreement beyond all reasonable doubt that at least one of the above aggravating circumstances exist in this case, the death penalty may not be imposed, and it will be your duty in such event to return into open court the following verdict written upon a separate sheet of paper:
"We, the jury, find that the defendant shall be sentenced to life imprisonment."
If you do unanimously believe beyond a reasonable doubt that any one or more of the above aggravating circumstances exist in this case, you must then consider whether there are mitigating circumstances which should be weighed in making your determination.
The mitigating circumstances which you may consider in determining whether or not the death penalty should be imposed are as follows:

(List mitigating circumstances)
After taking the above factors into consideration, if you are of the opinion the defendant should be sentenced to life imprisonment, you should return into open court the following verdict written upon a separate sheet of paper:
"We, the jury, find that the defendant shall be sentenced to life imprisonment."
On the other hand, before you would be authorized to administer the death penalty, you must proceed to weigh the aggravating circumstances and the mitigating circumstances, one against the other, to determine beyond all reasonable doubt from the evidence in this case whether the aggravating circumstances, if any, outweigh the mitigating circumstances.
If you unanimously find from the evidence, beyond a reasonable doubt, that any one or more of the aggravating circumstances listed above, if any, outweigh the mitigating circumstances, one against the other, and from such determination that the death penalty should be imposed, your verdict should be written on a separate sheet of paper, signed by your foreman, and in the following form:
"We, the jury, find unanimously and beyond a reasonable doubt the following aggravating circumstances:
(List the aggravating circumstances, if any, which you unanimously find beyond a reasonable doubt from those listed above in the same language as they are listed.)
"We, the jury, further find unanimously from the evidence and beyond a reasonable doubt that after weighing the mitigating circumstances and the aggravating circumstances, one against the other, that the mitigating circumstances do not outweigh the aggravating circumstances and that the defendant should suffer the penalty of death."
 _______________________
 FOREMAN OF THE JURY
If you fail to find any aggravating circumstance unanimously and beyond a reasonable doubt, or, if you find one or more aggravating circumstances unanimously and beyond a reasonable doubt, but after weighing the mitigating circumstances and the aggravating circumstances, one against the other, you fail to unanimously find beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances, then your verdict shall be written on a separate sheet of paper and be in the following form:

*1023 "We, the jury, find that the defendant should be sentenced to imprisonment for life in the state penitentiary."
If you are unable to unanimously agree on which circumstances outweigh the other, and arrive at a verdict fixing the punishment, then the form of your verdict should be as follows:
"We, the jury, are unable to unanimously agree upon the punishment to be inflicted."
If, after reasonable deliberation, you cannot agree as to the punishment, you should certify your disagreement to the Court and the Court shall, under the law, impose a sentence of imprisonment for life. Your verdict shall be written on a separate sheet of paper in the following form:
"We, the jury, after due deliberation, have been unable to agree upon the punishment and hereby so certify and request the Court to dismiss the jury from further deliberation."
NOTE: The changes from the model instruction have been italicized.
PATTERSON, C.J., joins this dissent.
NOTES
[1] Section 99-19-103 provides in part that, "If the jury cannot, within a reasonable time, agree as to punishment, the judge shall dismiss the jury and impose a sentence of imprisonment for life."
[2] Death cases affirmed by this Court or reversed as to punishment and remanded for resentencing to life imprisonment attached as Appendix "A".