# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 91-CA-00721-SCT

*TRYVALE LEVENE BROWN, A MINOR, BY AND*
*THROUGH HIS MOTHER AND NEXT FRIEND,*
*BOBBIE JEAN BROWN WEBB, AND BOBBIE JEAN*
*BROWN WEBB, INDIVIDUALLY*

*v.*

*DON J. BLACKWOOD, M.D.*

## CONSOLIDATED WITH

## 92-CA-01106-SCT

*TRYVALE LEVENE BROWN, A MINOR, BY AND*
*THROUGH HIS MOTHER AND NEXT FRIEND,*
*BOBBIE JEAN BROWN WEBB, AND BOBBIE JEAN*
*BROWN WEBB, INDIVIDUALLY*

*v.*

*DON J. BLACKWOOD, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | JUNE 28, 1991 -- OCTOBER 26, 1992 |
| TRIAL JUDGE: | HON. HONORABLE JOHN L. HATCHER |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | LEVI BOONE, III |
| | ISSAC K. BYRD |
| ATTORNEYS FOR APPELLEE: | L. CARL HAGWOOD |
| | ROY D. CAMPBELL, III |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 5/8/97 |
| MOTION FOR REHEARING FILED: | 5/22/97 |
| MANDATE ISSUED: | 8/14/97 |

**BEFORE DAN LEE, C.J., PITTMAN AND ROBERTS, JJ.**

**ROBERTS, JUSTICE, FOR THE COURT:**

# I.

## INTRODUCTION

¶1. Tryvale Brown was born at the Bolivar County Hospital with injuries arising from "birth-related trauma." His mother sued the delivering physician for medical malpractice. A first trial ended in mistrial when it became apparent that a number of the jurors had some connection with the doctor and/or his clinic. Before the second trial, questionnaires were sent to prospective jurors to identify those persons with connections to the doctor or Clinic. The judge permitted both parties to strike for cause any such person under *Hudson v. Taleff*, 546 So.2d 359 (Miss. 1989). The second trial ended in a verdict for the defendant. Some time after filing their appeal, the plaintiffs obtained a hearing on a motion to supplement the record. At the hearing, they were permitted to put on proof of the race of jurors peremptorily struck by the doctor. The doctor was permitted to proffer race-neutral reasons for his strikes. The plaintiffs seek a new trial, alleging the following errors:

> **I. WHETHER THE COURT ERRED IN APPLYING HUDSON V. TALEFF TO THIS CASE?**
>
> **II. WHETHER THE PLAINTIFFS ARE ENTITLED TO A NEW TRIAL UNDER THE MANDATES OF EDMONSON V. LEESVILLE CONCRETE CO. INC.**
>
> **III. WHETHER THE PLAINTIFFS ARE ENTITLED TO A NEW TRIAL BASED UPON THE IMPROPER SUBMISSION TO THE JURY OF THE MANSLAUGHTER CONVICTION AND UPON MISCONDUCT OF COUNSEL?**
>
> **IV. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE DEFENDANT/APPELLEE TO ADDUCE EVIDENCE AT THE HEARING ON THE PLAINTIFF/APPELLANT'S MOTION FOR LEAVE TO CORRECT OMISSION AND SUPPLEMENT APPEAL RECORD REGARDING THE RACE OF THE PROSPECTIVE JURORS PEREMPTORILY CHALLENGED BY THE PLAINTIFF/APPELLANT.**
>
> **V. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE DEFENDANT/APPELLEE TO MAKE AN OFFER OF PROOF REGARDING ALLEGED RACE NEUTRAL BASIS FOR DEFENDANT/APPELLEE EXERCISE OF PEREMPTORY CHALLENGES TO PROSPECTIVE JURORS IN THE TRIAL OF THIS CASE.**

Finding that the trial took proper steps to insure the selection of an impartial jury, and finding no reversible error, we affirm.

# II.

## FACTS AND PROCEDURAL HISTORY

¶2. Bobbie Jean Brown Webb ("Brown"), arrived at the Bolivar County hospital at 8:50 p.m. on

November 1, 1986, complaining of "leaking water." Then seven months pregnant, Bobbie Jean was examined by the emergency room physician on duty, Dr. Don Blackwood ("Blackwood"), who admitted her to the hospital for observation.[1] Blackwood states that he was informed at 9:25 p.m. that Brown had gone into labor. Tryvale Levene Brown was delivered breach by Blackwood, by 9:55 p.m. Tryvale was born with "birth-related trauma," specifically, cervical spinal cord injury resulting in total and permanent paralysis. Tryvale has remained hospitalized at the Pediatric Intensive Care Unit at the University Hospital almost his entire life.

¶3. On June 11, 1987, Brown plead guilty to a manslaughter charge arising from an automobile accident which had occurred on February 11, 1987.

¶4. On October 30, 1987, Brown filed a negligence action against Blackwood on behalf of Tryvale, and on her own behalf in the Bolivar County Circuit Court. She alleged that Blackwood had been negligent in failing to deliver Tryvale by Caesarian section, and his negligence had caused Tryvale's injuries. Blackwood's answer asserted there had been insufficient time to assemble an operating room crew to perform a Caesarian.

¶5. Trial was set for September 17, 1990.[2]

¶6. On August 31, 1990, Blackwood filed a motion for a change of venue, on the grounds that either he or members of his Clinic had "seen, examined and treated virtually every man, woman and child in Bolivar County, or an immediate family member thereof," that all such persons would be excused from service, and that as a result, it would be impossible to select a fair jury.

¶7. A jury panel was qualified and sworn on September 17, 1990. The panel was asked if anyone had been treated by Blackwood or other doctors at the Clinic. It was determined (by counting a show of hands) that about half of the 90 prospective jurors had been treated at the Clinic. Blackwood's motion for change of venue was denied, and voir dire was conducted beginning on September 18, 1990. Further voir dire was conducted in chambers. The judge read *Hudson v. Taleff*, during lunch, and upon return to chambers, determined that he would strike all persons on the jury list who revealed a connection with the Family Clinic or Blackwood. This left 43 prospective jurors. Challenges for cause were made, as well as several peremptory challenges. At this point, Blackwood's attorney, Hagwood, stated that of the jurors tendered to him, ten were patients of the Clinic, but had failed to reveal this during questioning. The judge stated there had already been sufficient opportunity to question such persons, and took no action. The jury was sworn, and trial began.

¶8. Before trial the following day, September 19, 1990, Blackwood's attorneys again brought to the court's attention that a number of the jury members had been patients at the Clinic. Blackwood was questioned in chambers concerning his treatment of seven of the jurors. The jurors were then questioned by the judge individually, revealing that a number of them had been patients or were closely related to a patient of the Clinic. The defense again moved for a mistrial. The judge denied the motion, dismissed four jurors, and instructed the Clerk to issue summons for 50 more jurors.

¶9. The following day, September 20, 1990, the judge determined that he was required to declare a mistrial, rather than replace the dismissed jurors and proceeding.

¶10. In a motion for change of venue filed September 26, 1990, Blackwood stated that the Clinic had examined a total of 51,913 patients; that according to the 1990 census, there were 42,000 residents of Bolivar County; that of the first jury venire of 200, 76.6% of those available had been patients of the Clinic within the past four years; that of the second jury venire of 50, 87.5% of those available had been patients within the past four years. Blackwood noted the first mistrial, and again asserted that it would be impossible to have a jury venire which would fairly represent the residents of Bolivar County.

¶11. A hearing was held on the motion for change of venue on February 12, 1991, before Judge John Hatcher. Patsy Ferretti, a Clinic employee testified that the Clinic had treated 52,910 patients since opening in 1974; that of the first 200 names drawn for the jury for the first trial, 131 had been patients at the Clinic; of the 90 available, 72 had been patients of the Clinic; that of a second list of 50 possible jurors, forty had been patients of the Clinic; that of the 32 available, 28 had been patients within the past four years. Judge Hatcher denied the motion for change of venue, and directed the Clerk to draw a panel of 250 jurors.[3] He also stated that he "expect(ed) the attorneys for the defendant to report and identify those jurors that fit in the category of patients as defined in the *Taleff* decision." He directed that a "pre-voir dire" questionaire be submitted to prospective jurors "to determine whether or not they fit within the definition of a patient as set forth in the Taleff decision."

¶12. On February 13, 1991, Judge Hatcher granted Brown's motion in limine to exclude her manslaughter conviction from evidence. The judge also granted Brown's motion to amend her complaint to include only claims for her own mental anguish.

¶13. Voir dire for the second trial was conducted starting the afternoon of April 22, 1991.[4] All potential jurors were first questioned together (that is, both those who had indicated a relationship with the Clinic, and those who had not). Consulting the questionnaires and patient lists, the judge and lawyers then identified those persons having some connection with the Clinic, either as a patient, or as the close relative of a patient.[5] The judge then requested challenges for cause "other than the *Taleff* challenges." A number of jurors were dismissed for cause. The judge called on the plaintiffs "to exercise their *Taleff* challenges." The judge stated that he would sustain a challenge by either side to any individual who had been identified as a patient. Both sides then went through the list, with the judge sustaining all challenges to the numerous individuals who had been patients.

¶14. Brown's attorney then stated to the court that Blackwood had "excused each and every black juror and ha(d) not excused a single white juror," in violation of *Batson*.[6] Blackwood's attorney responded that Brown's challenges had all been against white individuals, with two exceptions,[7] and that he (Blackwood's attorney) had merely struck all remaining patients from the Clinic. The judge noted that both parties "were doing the same thing." The judge denied the *Batson* challenge, on the grounds that *Batson* did not apply to civil cases, and also on the grounds that all the challenges were valid under *Taleff*. The judge then requested peremptory challenges on the remaining 41 jurors. Brown's attorney made his four peremptory challenges, followed by Blackwood's attorney. Three alternates were also chosen, with each attorney exercising two peremptory strikes.[8]

¶15. Before trial on April 23, 1991, the judge addressed a motion by Brown to strike claims in her amended complaint pertaining to physical damages or other expenses for care and treatment of

Tryvale, as well as the value of her services. The judge deleted those claims, leaving only those claims for mental anguish and expenses arising from such mental anguish. Trial proceeded, and the medical records of Bobbie Jean and Tryvale Brown were entered into evidence. In chambers, the judge referred to his earlier ruling that no reference could be made to Brown's incarceration. The judge agreed to allow Brown's attorneys to delete references to the period of incarceration (June 1987 to November 1989) from the nurses' notes on Tryvale's treatment before they went to the jury.[(9)] The same ruling was made as to the notes of social services workers.

¶16. The jury reached a verdict for Blackwood. The verdict was entered by the judge on May 1, 1991; Brown's motion for a new trial was filed on May 3, 1991. The motion alleged that Blackwood's attorneys had improperly referred to Brown's incarceration and lack of visits with Tryvale during that period, through an exhibit (9B) which contained records of a social worker who had tried to contact Brown during that period.

¶17. Brown filed a supplemental motion for a new trial on May 8, 1991, on the grounds of Blackwood's "racially discriminatory selection of the jury," and the court's error in applying *Taleff* to the case.

¶18. A hearing on the motions for a new trial was held before Judge Hatcher on May 31, 1991. Among other matters, Blackwood's attorney sought to show that Brown's attorneys had introduced records from the University hospital (social workers notes and nurses' notes) containing information about Brown's absence. Such records were contained in three big boxes, introduced into evidence as plaintiff's exhibit 13. Blackwood's attorney made the point that several exhibits he had introduced (in particular, D-9 (a), nurses' notes, and D-9(b), social workers' notes) had been extracted from the large Plaintiff's exhibit P-13. He stated that Plaintiff's exhibit had been placed into evidence before the introduction of D-9. Brown's attorney asserted that Hagwood had deliberately drawn the jury's attention to exhibit D-9 in his closing argument because that exhibit, the social worker's notes, made reference to Brown's conviction and incarceration. Hagwood responded that the court had granted Brown's attorneys permission to delete from Defendant's Exhibits D-9 any references to the conviction, but that apparently Brown's attorneys had not done so. Hagwood added that the Defendant's exhibits had been presented to Brown's attorneys prior to trial, and no objection had been made. He also stated that at the time he introduced exhibit D-9, he thought Plaintiff's attorneys had already removed the objectionable material from the exhibit.[(10)]

¶19. Brown's attorney then questioned Hagwood concerning his *Taleff* challenges, charging that he had struck every black patient of the Clinic. Hagwood responded that he had challenged all patients of the Clinic under *Taleff*. He further stated that he could not recall who he had struck with his peremptory challenges. Questioned by his own co-counsel, Hagwood stated that there had been no effort on the part of Blackwood's attorneys to exclude only black jurors with peremptory strikes; he again stated that he had struck for cause, under *Taleff*, all patients of the Clinic. The motions for a new trial were denied on June 28, 1991. Brown filed an appeal to this court on July 22, 1991.

¶20. At a hearing held before Judge Hatcher on November 15, 1991, the parties stipulated that because exhibit P-13 was "voluminous," for the purpose of appeal, the only portion of that exhibit which would be utilized was:

that part consisting of the nurses' notes, and the front page of the medical records to identify the

date of admission, and the last page of the medical records to indicate the last date the records were made, and that from that portion of Plaintiff's exhibit P-13, Defendant's exhibits D-9 -- D-9 (a) and D-9 (b) were taken.

Blackwood's attorney noted for the record that D-9 had been copied from the original medical records, introduced as P-13.

¶21. On September 30, 1992, Brown filed a Motion For Leave To Correct Omission and Supplement Appeal Record, seeking a hearing to allow testimony or other proof as to the race of the four jurors peremptorily struck by Blackwood. Blackwood's response to this motion asserted that Brown had failed to challenge or object to his (Blackwood's) peremptory challenges at trial.

¶22. A hearing on the motion to supplement was held on October 16, 1992, before Judge Hatcher. The parties stipulated that the four prospective jurors challenged peremptorily by Blackwood had been black. Hagwood, one of Blackwood's attorneys, testified that Brown's four peremptory challenges had been exercised against white prospective jurors. The judge did not permit Blackwood to put on proof as to the race-neutral reasons for his challenges, but allowed him to make a proffer.[(11)]

¶23. On October 26, 1992, the circuit judge entered an order 1) allowing Brown to supplement the record as to include the race of prospective jurors peremptorily challenged by Blackwood; 2) allowing Blackwood to supplement the record so as to include the race of prospective jurors peremptorily challenged by Brown; 3) forbidding Blackwood from putting on evidence as to a race-neutral basis for his preemptory challenges, and 4) permitting Blackwood to make an offer of proof as to the race-neutral basis for his peremptory challenges. Blackwood filed a cross-appeal concerning that part of the court's order forbidding him from adducing evidence of his race-neutral reasons for his peremptory challenges.

¶24. On October 26, 1992, Brown appealed that part of the October 26th order which allowed Blackwood to supplement the record, and to offer a race neutral basis for his exercise of peremptory strikes.

## III.

## DISCUSSION OF ISSUES

### I. WHETHER THE COURT ERRED IN APPLYING HUDSON V. TALEFF TO THIS CASE?

¶25. Brown argues that she was denied a fair trial because the court, improperly applying *Hudson v. Taleff*, granted challenges for cause to all patients of the Clinic and their immediate families. Brown argues that because of the "high utilization" of the Clinic in Bolivar County, it was impossible for her to obtain a jury representative of her peers, when all patients and their families were excluded from the jury. Brown contends that the trial court's application of *Taleff* resulted in prospective jurors being excluded on account of their race, social and economic status, and gender. Brown argues that her case is distinguishable from *Taleff* in that it was the plaintiff in *Taleff* who sought a new trial because the jury had contained several patients of the defendant doctor, while in her case, the

defendant doctor sought to remove his patients from the venire. Brown asserts that *Taleff* was intended "to protect the Plaintiff from the natural bias and prejudices that patients normally have in favor of their physicians." She also asserts that in a medical negligence case, the right to exclude prospective jurors from the venire on the basis of their defendant physician's Clinic "should rest, if at all, only with the Plaintiff."

¶26. Blackwood argues that the trial judge properly applied *Taleff* to insure an unbiased jury. Blackwood further argues that the judge followed *Taleff* by increasing the size of the available venire, and granting both parties the right to challenge for cause any patient of the Clinic or family member of a patient. Blackwood notes that the jury seated contained no members with relationships to Blackwood or the Clinic, and that the jury was therefore entirely impartial. Blackwood states that it was he who first pointed out the possible difficulty of selecting a jury in compliance with *Taleff*, and accordingly filed a motion for change of venue (which the plaintiffs opposed). Blackwood argues that the judge's application of *Taleff* afforded Brown the opportunity to strike any member of the venire the plaintiffs thought would be sympathetic to Blackwood, and that the plaintiffs took this opportunity.

¶27. The right to a jury trial is protected by Article 3, §31 of the Mississippi Constitution. In addition, Article 3, §14 of the Mississippi Constitution guarantees due process of law, including a fair and impartial trial. *Hudson v. Taleff*, 546 So. 2d at 363.

¶28. A circuit judge has wide discretion in determining whether to excuse any prospective juror, including one challenged for cause. *Scott v. Ball*, 595 So. 2d 848, 849 (Miss. 1992); *Mississippi Winn-Dixie Supermarkets v. Hughes*, 156 So. 2d 734, 738 (Miss. 1963). The circuit judge has an absolute duty, however, to see that the jury selected to try any case is fair, impartial and competent. *Scott*, supra; *King v. State*, 421 So. 2d 1009, 1016 (Miss. 1982). "Trial judges must scrupulously guard the impartiality of the jury and take corrective measures to insure an unbiased jury." *Hudson v. Taleff*, supra; *Miss Power Co. v. Stribling*, 3 So. 2d 807 (Miss. 1941).

¶29. In *Hudson v. Taleff*, a medical malpractice action, the jury returned a verdict for the defendant. On appeal, we reversed and remanded for a new trial, holding that the patient had been denied an impartial jury. Of the 40,338 qualified voters in Lauderdale County, where the case was tried, ninety-two persons were summoned for jury duty the week of the trial; of these, a jury pool of twenty-five was available. Of these twenty-five, twelve, or 48% had some connection with the doctor, his medical partners or his attorney. Mrs. Hudson, the plaintiff, challenged for cause thirteen of the twenty-five member jury pool. The judge excluded from service two jurors from the thirteen challenged. Mrs. Hudson requested a mistrial, asked the court to call additional jurors, grant additional challenges and to excuse those jurors for cause because of their relationship to the doctors or attorneys. The judge apparently declined to so, and Mrs. Hudson exhausted her peremptory challenges on some of the thirteen. In the end, two members of the jury had a connection with the doctor's firm. In finding that the jury was not impartial, we noted that trial judges "must scrupulously guard the impartiality of the jury and take corrective measures to insure an unbiased jury." *Hudson v. Taleff*, 546 So. 2d at 363. We cited *Mhoon v. State*, 464 So. 2d 77, 81 (Miss. 1985) for such "corrective measures":

Given the statistical aberration in the jury pool, the judge could have done several things to

ameliorate its prejudicial effect: 1) he could have afforded counsel additional peremptory challenges, 2) he could have increased the size of the available venire as well as affording additional challenges, or 3) he could have sustained at least some of the challenges for cause.

*Hudson v. Taleff*, 546 So. 2d at 363.

¶30. In the case at bar, the judge properly determined that *Taleff* was applicable, and followed the above directives in order to insure a fair trial for both parties. He summoned a large venire, and ordered that a questionaire be sent to all persons summoned, in order to reveal contact with the Clinic, and expedite choosing a jury. He meticulously cross-checked the juror questionnaires against the patient list provided by the defendant to insure unbiased jurors, and conducted individual voir dire where necessary to verify connection with the Clinic. He allowed both parties unlimited challenges to potential jurors with any connection to the Clinic, and sustained all such challenges by both parties. All such measures were appropriate under *Taleff*; in fact, it is hard to imagine more proper compliance with the mandates of that opinion, or with our subsequent decision in *Scott*.

¶31. In *Scott*, a widow sued the doctor of her late husband for medical malpractice, and the jury found for the doctor. On appeal, Mrs. Scott contended that the four peremptory challenges provided by rule had not been enough to excuse all prospective jurors who should have been excused for cause by the judge. She had challenged for cause twelve potential jurors based on voir dire responses that they or their family members had relationships with Dr. Ball or his Clinic. The judge had sustained seven of the challenges and denied the remaining five. While reversing and remanding for a new trial on other grounds (*Batson*), we commented on the trial judge's failure to follow *Taleff*:

> In this case the circuit judge could have excused these challenged prospective jurors and still have had remaining on the panel a sufficient number against whom there had been no challenge to form a trial jury. Furthermore, the circuit judge could have directed the clerk to draw more names from the jury wheel. *Hudson,* supra.
>
> (a) circuit judge should not hesitate in enlarging the jury panel when legitimate questions for cause, for whatever reason, arise...

*Scott*, 595 So. 2d at 850. Moreover, we commented on the problems peculiar to medical malpractice cases tried in smaller communities:

> In a suit in which a physician is a party, a circuit judge must be sensitive to the qualification of a juror who has himself or herself been treated by him, or whose family members have at onetime or another been patients of his. This is especially true in our smaller cities and towns, where often there is a shortage of practicing physicians. Mississippians in less populated areas enjoy a close fraternal relationship with their doctors, and regardless of a prospective juror's complete sincerity in his belief of his ability to be fair, it is only human nature that in most cases he will be more than reluctant to return a verdict against the physician. The circuit judge recognized this, of course, when he excused seven of the jurors challenged for cause for this reason. He erred in not excusing prospective juror Smith, No. 20, for cause for this reason.

*Id*. These comments express concern that the plaintiff in a medical malpractice suit will not get a fair shake, and do not show a similar concern for the defendant. Nevertheless, the right to an impartial

jury is possessed by both parties, and, Brown's assertion to the contrary, this right permits strikes by medical malpractice defendants, as well as plaintiffs, on individuals whose contact with the doctor might prejudice their hearing of the case.

¶32. Also contrary to Brown's assertion, there is no indication that the plaintiffs were denied a jury of their peers by the application of *Taleff* to this case. The jury seated consisted of four blacks and seven whites. Nothing in the record suggests that blacks were more likely than whites to have some connection to Dr. Blackwood or the Clinic, or otherwise shows that the effect of excusing potential jurors with some connection to the Clinic was to exclude a disproportionate number of blacks.

¶33. Finally, we have stated that the selection of jurors is "a judgment call peculiarly within the province of the circuit judge, and one we will not on appeal second guess in the absence of a record showing a clear abuse of discretion." *Scott*, 595 So. 2d at 850. No such abuse of discretion appears in the record; to the contrary, the judge's actions to insure an impartial jury are to be commended. He properly applied *Taleff*, and followed procedures consistent with that opinion. We affirm his judgment.

## II. WHETHER THE PLAINTIFFS ARE ENTITLED TO A NEW TRIAL UNDER THE MANDATES OF <u>EDMONSON V. LEESVILLE CONCRETE CO. INC.</u>

¶34. Brown contends that Blackwood exercised each of his peremptory challenges against black prospective jurors, in violation of *Batson*. Brown argues that under *Edmonson v. Leesville Concrete Co. Inc.,* 500 U. S. 614 (1991), which held *Batson v. Kentucky*, 476 U.S. 79 (1986), applicable to civil cases, this case must be reversed and remanded for a new trial.

¶35. Blackwood argues that Brown failed to raise a *Batson* challenge at the time peremptory strikes were made, thereby waiving her right to raise this issue on appeal. He argues that Brown instead objected to his (Blackwood's) *Taleff* challenges, which occurred prior to the peremptory challenges. Blackwood further explains that Brown, in exercising her *Taleff* challenges, had struck all white veniremen connected with the Clinic, but had left black veniremen connected with the Clinic. Blackwood states that in seeking to eliminate all jurors connected with the Clinic, he necessarily struck only black veniremen because that was all that was left, i.e., "(p)laintiffs had selectively left them on the panel." Blackwood asserts that the trial court properly found that all such challenges were valid under *Taleff,* and properly found that Blackwood had provided a sufficient race neutral reason for *Batson* purposes - striking all remaining Clinic-connected veniremen. Blackwood asserts that if Brown did in fact preserve the *Batson* issue, the remedy would be a limited remand to allow him to give evidence supporting his proffer of the race neutral reasons for his peremptory challenges.

¶36. Brown's attorneys voiced their *Batson* claim after Blackwood exercised his *Taleff* challenges, which was after Brown's attorneys had exercised their *Taleff* challenges. Blackwood's attorney explained his challenges:

> MR. JACKS: Your honor, for the record, with the exception of two people, one of whom works for me and who is black, Ms. Murry, and the other who identified himself as working for the Valley Bank and has a great deal of contact with me; all of the jurors that the Plaintiffs challenged were white. We simply knocked the remaining patients from the Clinic off the panel so that we would have a list of jurors to choose a jury from who were completely unbiased and

> unprejudiced and have no relationship whatsoever with the Defendant.
>
> THE COURT: I did note that both of you were doing the same thing except for -- what were the two exceptions, Mr. Jacks?
>
> MR. JACKS: Ms. Murry who identified herself as working for me, who had been challenged for cause earlier by the Plaintiffs, and it was denied. And Kenneth Morgan who has identified himself as having been previously represented by me and working for the Valley Bank who is a client of mine.
>
> THE COURT: Okay. The motion relating to the Batson challenges will be denied for several reasons. One, it is a civil case. The other is, we are dealing with cases which the Taleff challenges would have been in order in each and every case.
>
> O.K. Let's go to peremptory challenges...

Brown's attorneys raised no objection on *Batson* or other grounds during the peremptory challenges.

¶37. *Batson* was held applicable to civil cases in *Edmonson v. Leesville Concrete Co.,* decided after the plaintiffs in this case filed their appeal. In *Scott*, we held that *Edmonson* should be applied retroactively to a civil case pending on review, according to the same logic by which *Batson* was applied retroactively to criminal cases under *Williams v. State*, 507 So. 2d 50 (Miss. 1987) and *U.S. v. Brown*, 479 U.S. 314 (1987). *See Scott*, 595 So. 2d at 852-853. Therefore, if a *Batson* claim was properly raised in the case at bar, *Edmonson* should be applied retroactively to determine if racial discrimination occurred in the use of peremptory challenges, thus denying the plaintiffs a fair trial.

¶38. However, there are several hurdles which the appellants in this case must overcome before the application of *Batson* and *Edmonson*. First, as noted above, Brown's attorneys raised their *Batson* challenge at the time of the *Taleff*, or for-cause strikes. *Batson* applies to the use of peremptory challenges, not to the court's excusals for cause. *Shaw v. State*, 540 So. 2d 26, 27 (Miss. 1989).[(12)] Therefore, Brown's *Batson* challenge to Blackwood's *Taleff* strikes could not succeed. Second, Brown's attorneys did not raise their *Batson* claim at the time of Blackwood's peremptory strikes. Under *Shaw,* where *Batson* is not raised during the jury selection, any challenge to the racial composition of the jury is waived. 540 So.2d at 27. Generally, timely requests an motions for a ruling at trial are necessary to preserve an issue on appeal. Therefore, it could be said that the appellants in this case waived their claim.

¶39. However, assuming for the sake of argument that the plaintiffs raised their *Batson* claim at the proper time, preserving the issue for appeal, it must be determined what type of relief, if any, the plaintiffs would be entitled to under a retroactive application of *Edmonson*.

¶40. In *Scott,* we considered the retroactive application of *Edmonson* to a medical malpractice case decided in favor of the defendant doctor. Plaintiffs had made a timely *Batson* challenge at the peremptory strike stage, and *Edmonson* was handed down after their appeal. On appeal, the doctor requested that in light of *Edmonson*, this Court remand for a *Batson* hearing before the circuit judge, as authorized in *Williams*. He suggested that if the judge found that racial discrimination had occurred in the use of peremptory challenges, then a new trial should be ordered; if he found that a

race-neutral reason existed for the peremptory challenges, a record of the hearing and the circuit judge's findings should be submitted to this Court. The plaintiff argued for reversal of the case. We discussed the reasoning of *Williams*:

> We held that Williams made a prima facie case of illicit peremptory challenges, and that the prosecutor's explanation for peremptory challenges was insufficient under *Batson*. We further held, however, that reversal was not necessary because *Batson* had not been decided when the district attorney made the challenges, and the prosecution could not be said to have waived the opportunity to offer racially neutral reasons in its exercise of peremptory challenges because it had no reason to know it was obligated to do so. We remanded with instructions that the district attorney be given an opportunity to offer racially neutral explanations for each of the peremptory challenges he used on black persons, and held consideration of the appeal in abeyance until a *Batson* hearing in the circuit court was conducted. If the circuit court found purposeful discrimination in the prosecution's use of the peremptory challenges, it should order a new trial. However, if the court did not find any impermissible discrimination, we would consider the evidence adduced at the hearing to determine if reversal was required.

*Scott*, 595 So. 2d at 852-853. We then weighed remand for a hearing against reversal:

> There is much to be said for the procedure we followed in *Williams*, and the defense in this case had no more reason to anticipate *Edmonson* than the district attorney in *Williams* to anticipate *Batson*.
>
> Again, however, experience has taught us that cases in general should not be tried in bits and pieces. Judicial economy is not advanced thereby.
>
> This is a civil case, and although it is a complaint of malpractice against a doctor, it should not entail complex or detailed evidence and, at least as far as the defendant doctor is concerned...witnesses in his defense should be easily and readily available. This case, in the interest of both parties, needs to be tried and concluded as soon as reasonably possible.
>
> There is another problem with simply remanding for a circuit judge *Batson* hearing. When the four black prospective jurors were peremptorily challenged, counsel had no reason to suppose he had to have any reason at all to excuse them. Asking him and the circuit judge two years later to resurrect from memory some *Batson*-approved basis for peremptory challenge is neither fair nor satisfying.
>
> There may be cases in which judicial economy will be better served by a *Williams* procedure, but that will be a case having special or unusual features. This is not such as case.
>
> Accordingly, we reverse and remand for a new trial.

595 So. 2d at 853 (emphasis added).

¶41. The case at bar did have a special or unusual feature: a jury pool with an unusually large number of potentially biased individuals. This "unusual feature" prompted the judge to initiate special procedures under *Taleff*. Clearly, not only would judicial economy be better served by a *Williams* procedure than by reversal, the equivalent of a *Williams* procedure has already been held, i.e., the

hearing on Brown's motion to supplement.

¶42. At this hearing, the judge did not permit Blackwood's attorney to put on evidence as to the race-neutral reasons for his peremptory challenges.[13] However, Blackwood's attorney was permitted to make a proffer as to the race neutral reasons for his four peremptory strikes. Hagwood stated that he had challenged juror 26, Moses Riley, because Riley had been represented by Levi Boone in the past; juror 40, Juanita Todd, had been challenged because she was a nursing assistant, prompting concern about how her profession would affect her consideration of the case; juror 65, Susan Franklin had been challenged because she worked in a day care center, and because her grandchild had cerebral palsy; Blackwood's lawyers were concerned that she would be "totally over sympathetic" toward a small child with the same type injuries as Tryvale; juror 64, Willie George Sisson, had been challenged because he had stated he knew Bobbie Jean Brown Webb's husband, Roosevelt Brown.

¶43. These are valid, race-neutral reasons under *Batson* and *Edmonson*. Even if *Edmonson* is applied retroactively to this case, reversal is not warranted.

### III. WHETHER THE PLAINTIFFS ARE ENTITLED TO A NEW TRIAL BASED UPON THE IMPROPER SUBMISSION TO THE JURY OF THE MANSLAUGHTER CONVICTION AND UPON MISCONDUCT OF COUNSEL?

¶44. Brown argues that Blackwood's lawyer improperly submitted her manslaughter conviction to the jury in his closing arguments, in violation of the judge's order to exclude any evidence of the conviction or her lack of visitation during incarceration. Brown also argues that Blackwood committed misconduct by introducing evidence - UMC medical records and social work records - which contained references to the incarceration and lack of visitation. Brown asserts that such misconduct mandates a new trial.

¶45. Blackwood argues that he made no reference to Brown's manslaughter conviction or incarceration during closing arguments. Blackwood also argues that the medical records he introduced into evidence - Exhibits D-9(a) and D-9(b) - which Brown complains contained references to her lack of visitation, had already been introduced by Brown herself as Plaintiff's exhibit P-13. Blackwood notes that the judge granted Brown's request to delete from these records any reference to the conviction or lack of visitation during incarceration before the records went to the jury. However, Blackwood argues, Brown's attorneys failed to make such deletions, and therefore "concocted" their misconduct charge against Blackwood.[14]

¶46. During his closing argument, Blackwood's attorney stated in part:

> But we got down looking at Bobbie Jean Brown's claim for mental anguish. I sat down and I went through those medical records from the University of Mississippi Medical Center, and months would go by without any contact of Bobbie Jean Brown down there even though she had a toll-free telephone number. And during this period of time, she visited a total of eleven times down there and all of those -- six of them occurred during one week when she stayed at the Ronald McDonald House. And if you go through the social worker's notes which are in there, you'll find that months would go by where they searched trying to find Bobbie Jean Brown and could not locate her in spite of the fact that Dr. Miller repeatedly asked them to try to find or locate her...

Brown argues that two of the eleven visits referred in this closing argument occurred during her incarceration, and therefore constituted an impermissible reference to such incarceration. She provides a list of dates of her visits, including 10/6/87, and 10/23/87, during the incarceration. Blackwood provides a somewhat different list of eleven visits, none of which occurred during the period of incarceration. The record shows that the eleven visits did in fact occur on the dates provided by Blackwood. It may be noted that for several of the dates (June 13, 14 and 15, 1990), each of two or three entries concerning Brown's presence with Tryvale are counted as a separate "visit." For example, on June 13, 1990, there is one entry at 10 a.m., and another at 6 p.m.; Blackwood counts these as two separate "visits." In theory, it is possible that Brown remained in the hospital for the entire day, and arguably, the separate entries should not be considered separate "visits." Nevertheless, Blackwood's attorney's closing argument stated that Brown "visited a total of eleven times," and such description may fairly be interpreted as consistent with the evidence. In any event, it cannot be said that Blackwood's reference to "eleven visits," without further specificity, improperly referred to any visits during the incarceration.

¶47. Brown also argues that the statement "Dr. Miller repeatedly asked them to try to find or locate her" also refers to the incarceration, because Dr. Miller's requests were made only during the period of incarceration, and not at any other time. Blackwood argues that such requests by Dr. Miller, and attempts by the social workers were made in late 1989 through late 1990. Again, the records support Blackwood's assertions. Therefore, it cannot be said that Blackwood's statement concerning requests to find Brown improperly referred to the period of incarceration.

¶48. Finally, Brown asserts that the statement "if you go through the social worker's notes which are in there" (exhibit D-9b) improperly invited the jury's attention to references in the notes to her incarceration. Blackwood counters that Brown herself had already introduced those same notes as part of a larger exhibit, P-13, consisting of all Tryvale's medical records at the University Medical Center. While securing the court's permission to delete all references to incarceration from exhibit D-9, Brown made no attempt to delete such references from the identical materials in P-13. Therefore, Blackwood asserts, the plaintiffs cannot now complain that the information was improperly before the jury.

¶49. Blackwood has the better argument. Brown herself introduced "the social worker's notes which are in there," and did not take the necessary steps to delete reference to her incarceration. "One may not complain on review of errors for which he was responsible...(a)n appellant will not be permitted to take advantage of errors for the commission of which he was responsible, or which he himself committed, caused, brought about, provoked, participated in, created, or helped to create, or contributed to." *Planters Bank v. Garrott*, 122 So. 2d 256, 261 (Miss. 1960). In particular, where a party has introduced evidence on an issue, that party may not complain about the admission of evidence on the same proposition by an opposing party. *Thornton v. Shows*, 537 So. 2d 1363, 1366 (Miss. 1989); *Deposit Guaranty Bank & Trust Co. v. Nelson*, 54 So. 2d 476, 480 (Miss. 1951). *See also Glo-Ann Plastic Industries, Inc. v. Peak Textiles, Inc.*, 216 S.E.2d 715, 718, 134 Ga. App. 924, 927 (1975) ("where an advocate fails to make the necessary motion for concealment of any material in a document that is otherwise admissible, then such failure amounts to a waiver").

¶50. In sum, Brown's contention that Blackwood's closing argument improperly referred to her incarceration, and that Blackwood improperly submitted evidence of the incarceration to the jury, is

without merit.

**IV. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE DEFENDANT/APPELLEE TO ADDUCE EVIDENCE AT THE HEARING ON THE PLAINTIFF/APPELLANT'S <u>MOTION FOR LEAVE TO CORRECT OMISSION AND SUPPLEMENT APPEAL RECORD</u> REGARDING THE RACE OF THE PROSPECTIVE JURORS PEREMPTORILY CHALLENGED BY THE PLAINTIFF/APPELLANT.**

¶51. Brown argues that it was error to allow Blackwood to adduce evidence at the post-trial hearing as to the race of prospective jurors peremptorily challenged by the plaintiffs, because 1) Blackwood had made no *Batson* objection during trial, and 2) the race of these jurors was not relevant to the issue raised by the plaintiff's motion. Blackwood agrees that he raised no *Batson* issue at trial, but submits that the fact that Brown used her peremptory challenges against white prospective jurors only was relevant, because this practice had a direct bearing on the racial composition of the venire tendered to him. Blackwood also asserts that the fact that he was permitted to offer evidence concerning the race of jurors struck by Brown is "a non issue" on appeal; that at best, the court's ruling properly admitted evidence relevant to an issue not raised by the defendant, and at worst, it constitutes harmless error.

¶52. Blackwood second argument is more persuasive. The judge held this hearing for the purposes of supplementing the trial record, so that the plaintiff/appellant's *Batson* claims could be properly assessed on appeal. The fact that arguably extraneous information - the race of jurors Brown struck - entered the record has had no effect on the consideration of Brown's *Batson* claims. "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected." *Century 21 Deep* South *Prop. v. Corson*, 612 So. 2d 359, 370 (Miss. 1992), citing M.R.E. 103 (a). No substantial rights of either party were affected by the evidence admitted, and therefore its introduction was, at worst, harmless error.

**V. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE DEFENDANT/APPELLEE TO MAKE AN OFFER OF PROOF REGARDING ALLEGED RACE NEUTRAL BASIS FOR DEFENDANT/APPELLEE EXERCISE OF PEREMPTORY CHALLENGES TO PROSPECTIVE JURORS IN THE TRIAL OF THIS CASE.**

¶53. Brown argues that the court erred in allowing Blackwood at the post-trial hearing to proffer information regarding the race-neutral reasons for his peremptory strikes of black jurors. Brown argues that in *Scott*, this Court refused to utilize the procedure outlined in *Williams v. State*, 507 So. 2d 50 (Miss. 1987), whereby a hearing is conducted for the judge to determine whether racial discrimination occurred in the use of peremptory challenges. In *Scott*, we explained that it would be "neither fair nor satisfying" to ask the judge and lawyers to resurrect from memory some *Batson*-approved basis for the peremptory challenges two years after trial. 595 So. 2d at 853. Brown argues that under such logic, this Court should "give no credence" to the race-neutral reasons proffered by Blackwood.

¶54. Blackwood argues that in light of the fact that Brown failed to make a *Batson* objection to the peremptory strikes at trial, and did not raise such objection until after the trial, it was proper for the

judge to permit his proffer of race-neutral reasons at the hearing. Blackwood distinguishes this case from *Scott* on the grounds that the plaintiffs in that case raised a *Batson* objection at the proper time. Further, Blackwood notes that in *Scott*, this Court stated that in some cases, judicial economy would be better served by a *Williams* procedure, rather than reversal and a new trial; Blackwood argues that this is such a case.[(15)] Finally, Blackwood submits that if this Court does consider Brown's "untimely *Batson* objection," then it was error for the trial court to refuse him the opportunity to offer proof as to his race-neutral reasons, and that the case should be remanded for the sole purpose of allowing him to adduce such evidence.

¶55. This is just such a case, as imagined by this Court in *Scott*, in which judicial economy would better be served by a *Williams* procedure than by reversal and retrial. In fact, such procedure has already occurred, and Blackwood has proffered his race-neutral reasons. As to Brown's assertion that the judge erred in allowing Blackwood's proffer, it may be asked how else, other than by review of the proffer, might this Court assess Brown's own *Batson* claims? Brown's argument that the proffer should have been refused is without merit.

¶56. In sum, we hold that under the facts of this case, the *Williams*-type procedure at which Blackwood proffered his race-neutral reasons for peremptory challenges adequately protected the rights of both parties.

## IV.

## CONCLUSION

¶57. The trial judge properly applied *Hudson v. Taleff* to this case, and took appropriate steps to insure that no member of the jury had any connection to Blackwood or his Clinic. Brown is not entitled to a new trial under *Edmonson v. Leesville Concrete Co., Inc.,* because 1) she made no timely *Batson* challenge to Blackwood's peremptory strikes, and 2) Blackwood provided valid race-neutral grounds for his peremptory strikes. Blackwood's counsel made no improper reference to Brown's incarceration during his closing arguments. The trial judge did not err in permitting Blackwood to introduce evidence at the post-trial hearing as to the race of prospective jurors peremptorily struck by Brown; at worst, the admission of such evidence was harmless error. The trial judge did not err in allowing Blackwood to proffer the race-neutral reasons for his challenges.

¶58. Finally, we commend the trial judge for his perserverence and efforts in securing a fair trial for both parties.

**¶59. JUDGMENT IS AFFIRMED.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, SMITH AND MILLS, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.**

1. Blackwood's brief states that he is a family practitioner in Cleveland, and that due to a lack of qualified emergency room physicians to staff the Bolivar County Hospital emergency room at night

and on weekends, he and other Cleveland physicians staffed the emergency room at such times.

2. The procedural history of the first trial, which ended in mistrial, is included because it provides some insight as to the judge's actions at the second trial.

3. The judge stated "I am not willing to give up yet on the possibility of a fair and impartial jury being drawn in Bolivar County."

4. The judge and the attorneys discussed the possibility of dismissing all potential jurors who had a connection with the clinic (patient, close relative of patient) before voir dire. Plaintiff's attorney was in favor of this. However, the judge decided to have the attorneys conduct voir dire as usual, and then allow the defendant to exercise challenges to particular jurors under *Taleff*, if the defendant so desired.

5. The judge noted that the questionnaires had been checked against the patient list. Potential jurors who had neither answered that they had been a patient, nor had appeared on the patient list were identified. Of the total, there were 26 in this category. There were 6 who had stated they were not patients, but were contradicted by the patient list, and 19 who had stated they were not patients, and had been neither corroborated or contradicted. The judge and the lawyers went through the various lists and changed the designations of several potential jurors from non-patient to patient, where their names appeared in Clinic records.

6. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 69 (1986).

7. One individual worked for Blackwood; the other had significant contact through a bank.

8. The following day, juror Minnie Taylor informed the court that she had just discovered that Dr. Blackwood was to deliver her daughter's baby. She was dismissed and one of the alternates took her place.

9. Specifically, the court stated that the plaintiffs would have the opportunity to make deletions from the nurses notes "to the fact that she did not visit the child."

10. Hagwood stated that he so believed because he had seen "y'all examining the exhibit several times, particularly after my cross-examination of Bobbie Jean Brown."

11. The contents of this proffer will be discussed in a later section of this opinion.

12. This is not to say that for-cause challenges which are mere pretexts for racial motivation do not violate the United States Constitution under the rationale of *Batson* and its progeny. It is to be assumed that any legitimate for-cause challenge would be for a reason other than race, and race-neutral within the meaning of *Batson* procedure for peremptory challenges. However, as with peremptory challenges, for-cause challenges for facially race-neutral reasons which are shown to be pretextual may violate the parties' rights to a jury selected free of racial discrimination, as well as a juror's right to be free from racially-motivated exclusion.

13. The judge's reason for so doing was not expressed.

14. Blackwood notes that Brown's attorneys made no motion or other attempt to delete references to

incarceration or lack of visitation from their own exhibit P-13, which contained the same records as D-9(a) and (b).

15. Blackwood notes that the first trial of this case ended in mistrial; that the second trial lasted eight days; that multiple experts testified for both sides, and that thousands of pages of testimony were taken.