# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2013-KA-01742-SCT

*MARVIN KIRK*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/09/2013 |
| TRIAL JUDGE: | HON. WILLIAM E. CHAPMAN, III |
| TRIAL COURT ATTORNEYS: | MARY B. COTTON |
| | GREGORY V. MILES |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | PHILLIP W. BROADHEAD |
| | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| | JOHN R. HENRY, JR. |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/05/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., KITCHENS AND COLEMAN, JJ.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     Marvin Kirk was tried and convicted of aggravated domestic violence in the Circuit Court of Madison County. He was sentenced as a Section 99-19-81 habitual offender to twenty years in the custody of the Mississippi Department of Corrections. The State alleged that Kirk twice had strangled his wife, Casey. At trial, witnesses testified that Casey had red marks on her neck shortly after the alleged assaults had occurred, and Casey testified that

Kirk had strangled her. Kirk denied so doing. Finding Kirk's assignments of error to be without merit, we affirm his conviction and sentence.

**STATEMENT OF THE FACTS**

¶2.    On Friday, January 25, 2013, Marvin Kirk, home from working offshore, woke around ten o'clock in the morning at his residence at 208 Waldrop Road in Madison County. Kirk testified that he went to a hardware store to purchase tools to repair a leaking faucet in the bath tub in the master bathroom. He testified that nothing occurred that day except "the ususal being married." Casey Kirk, Marvin's wife, who did not work outside the home, testified that she and the couple's two-year-old son Gabriel had spent the majority of the day at home watching cartoons, "until about 6:00 or so." She testified that her husband took her keys, phone, and wallet away from her, because "[h]e said I was doing drugs and that I was wanting to go get drugs and that I was cheating on him" and that, generally, "[h]e was just in an ill mood, just wanting me to do whatever he wanted me to do and control me." Casey testified that she did not use drugs on Thursday, January 24, 2013, or on the following weekend.

¶3.    Casey testified that, at some point that Friday evening, Marvin began complaining that the house was dirty. When Marvin started complaining, the family was "sitting on the couch in the living room," so Casey got up to wash dishes. She said, "And I'm washing dishes, and he kept yelling at me, and I got irritated because I've done everything he wants me to do." Casey testified that, as the argument escalated, "[h]e started coming towards me." Marvin allegedly kicked Casey, which resulting in her falling onto the refrigerator. At that point, Casey testified, Marvin grabbed her by the neck and proceeded to choke her in the presence

2

of their son. She stated that she was not able to breathe. When Marvin released her, Casey "gasped for breath," grabbed her son, and proceeded again to wash dishes "with Gabriel right beside me" in an effort to prevent Marvin from getting angrier. After completing the dishes, Casey and Gabriel returned to the sofa. Casey testified that Marvin "told me that my mouth was going to get me put in a shallow grave outside if I didn't shut up." That night, Casey and Gabriel shared her bed.

¶4. The next morning, Saturday, January 26, 2013, Casey and Gabriel watched cartoons until Marvin got up, again around ten o'clock. Marvin had slept in his chair in the living room. Casey testified that, when Marvin got up to go to the bathroom, she rushed to Marvin's chair, where he had been sitting for two days, in an effort to find her phone and her keys. She located both her phone and her keys and, when Marvin returned from the bathroom, he began asking Casey questions regarding why she needed them. He threw her phone out the back door into the kudzu and proceeded to wrestle with Casey to get her keys back. Casey testified that, as they were wrestling, she informed Marvin that she needed to go to the hospital. Finally, Marvin "got the keys away from me and broke the lanyard. Whenever it broke the lanyard, it cut my hand."

¶5. The melee continued, and "[h]e grabbed me, and he put me on the ground, and he choked me until where I couldn't see or breathe or anything." This occurred between the kitchen and the living room, because "the living room has carpet, the kitchen has hard floors," and Casey's "back was on the carpet, but [her] head was on the hardwood floor." Marvin allegedly "choked [Casey] completely out," meaning Casey "lost consciousness." When she came to, Casey testified, she searched frantically for a cigarette. When she located

3

one, she "lit it in the house, not thinking. And he got mad at me, and he tried to wrestle the cigarette away from he, and was trying to burn me with the cigarette." According to Casey, Marvin succeeded in burning her with the cigarette.

¶6.    Casey testified that, at that point, she was able to grab Gabriel and walk out the back door. In hopes the "across-the-street neighbors," the Hobsons, were home, Casey fled there, but they were not home. Casey then returned to her driveway, "because I kept hearing car doors slamming" and she observed Marvin packing up the family car. He threatened to lock her out of the house, which he then agreed not to do. As he was walking to unlock the house door, Casey "put Gabriel down in the middle of the driveway" and "ran over there to try to get the car seat." Marvin pushed her away. Casey then "got really scared again," picked up Gabriel and ran back through the woods to her landlord's house.

¶7.    Colita Ogletree, whom Casey had never met, was the wife of the Kirks' landlord, David Ogletree, a neighboring homeowner. Casey did not want her landlord "to see how crazy and messed up my family was because we were renting the house from them." Nevertheless, because other neighbors, the Hobsons, were not home, Casey fled to the Ogletrees' house. Colita answered the door and Casey informed her that her husband had strangled her and that she needed to place a telephone call to 911. At trial, this recorded 911 call was played for the jury.

¶8.    Marvin's testimony at trial consisted of a significantly different version of events. He denied yelling at Casey during the weekend in question. He denied keeping Casey's telephone or keys from her, testifying that she had three phones and her keys were kept in magnetic boxes under the cars' hoods. He denied burning or attempting to burn Casey with

4

a lit cigarette. He testified that, on the weekend in question, Casey "was looking for a bag of crystal meth that she inadvertently folded up in a towel and dropped on the floor." When Marvin informed Casey that he had flushed her methamphetamine, she began "digging through the house, just through everything, through stuff that you wouldn't look through generally if you were looking for something."

¶9.    Marvin testified that, when Casey realized that her methamphetamine was gone, she went on a tirade: "I'm talking about like, 'You don't do nothing for this family, all you do is bitch. . . . All you do is gripe about what I don't do.'" He then collected his packed bags, his boots, his hard hat, and his life jacket and headed offshore. Marvin testified that, as he was packing the truck, Casey begged him to stay—in fact, he testified that Casey cut her thumb in an effort to wrest his keys from him as he was trying to leave. He denied that he ever had assaulted or choked his wife. He testified that the marks on Casey came from running though the woods to get to the Ogletrees' house. On cross examination, Marvin testified that no marks had been on Casey's neck when he left the house, and that he was unaware of how she had gotten the bruise on her arm or the cigarette burn. Marvin testified that he was pulled over by the police, who took him to the Ogletrees' house.

¶10.    Colita Ogletree testified that when Casey arrived at her house, "[s]he was just very alarmed when she came in, and she showed me her forearm. It looked like she had a goose egg."Also, Colita noticed that Casey's neck was red. She testified that "she just had kind of a goose egg on her bicep and some bruising, and her neck was red."

¶11.    Deputy Sheriff Tommy Strait, the officer who responded to the call from the Ogletrees' house, testified that he and Deputy Sheriff Brad Sullivan had received a call about

5

a potential domestic-violence case on Waldrop Road involving a white Toyota Forerunner. According to Strait, on the way to Waldrop Road, "we came into contact with him, Marvin Kirk, and detained him at the time and went to where Casey Kirk was." When asked about Casey's demeanor, Strait testified that;

> She was scared and frantic and just really didn't know what to do because she was worried about Mr. Kirk coming back to where she was and getting her, as she said. I also noticed around her neck she had strangulation marks. She had several bruises upon her also.

Strait then photographed Casey's injuries and called an ambulance to take her to the hospital.

¶12.    Deputy Sullivan testified that, when he observed the Toyota Forerunner, he detained Marvin, placed him, in handcuffs, into the back seat of a patrol car, and returned him to Waldrop Road. When the deputies arrived at the Ogletrees' residence, Strait and Sullivan left Marvin in the patrol car outside and went in to speak with Casey. Sullivan testified that when he noticed that Casey "had red marks on her neck that she was pointing out to Deputy Strait, and she had some red marks on her arms," he returned outside and read to Marvin his *Miranda*[1] warnings, because "Mississippi state statute says domestic violence with strangulation is a felony domestic charge."

¶13.    On April 3, 2013, Marvin Kirk was indicted by a Madison County grand jury under Mississippi Code Section 97-3-7(4) for aggravated domestic violence. On July 26, 2013, the State moved to amend Kirk's indictment to charge him as an habitual offender under Mississippi Code Section 99-19-81. Kirk previously had received a 1998 conviction for grand larceny in Yazoo County, Mississippi, for which received a five-year sentence with

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

three years and six months suspended, leaving one year and six months to serve and one year of supervised probation following release from custody.[2] In 2007, Kirk had received a burglary conviction in Yazoo County, Mississippi, and was sentenced to serve six years, with two years to serve and four years of post-release supervision.[3] On August 12, 2013, the Madison County Circuit Court ordered the amendment of Kirk's indictment to include the Section 99-19-81 habitual-offender charge. Kirk was tried on August 28, 2013, and was found guilty of aggravated domestic violence by a Madison County jury.

¶14. On October 7, 2013, the trial court sentenced Kirk as an habitual offender to twenty years' imprisonment, the statutory maximum for aggravated domestic violence. *See* Miss. Code Ann. § 97-3-7(4)(a) (Rev. 2014). The trial court denied Kirk's motion for judgment notwithstanding the verdict, or in the alternative, for a new trial, on October 11, 2013. Kirk filed a notice of appeal to this Court on October 16, 2013.

¶15. Kirk raises four issues for review by this Court:

  I.   Whether it was plain error for the trial court to permit a law enforcement officer to testify to medical causation, that the victim's injuries appeared to be a result of strangulation, in a case in which strangulation was an element of the crime charged in the indictment.

  II.  Whether the trial court erred by denying the Appellant's motion for judgment notwithstanding the verdict  or, in the alternative, for a new trial.

  III. Whether the trial court erred by excluding letters and a text message.

---

[2]The sentence computation record reflects that, on Kirk's 1998 sentence, the sentence commenced on April 10, 1998. Kirk was discharged on September 20, 1999.

[3] As for the 2007 burglary charge, Kirk's sentence commenced on August 8, 2007, and he was released on probation on July 10, 2008. Prior to being sentenced, the sentence computation record reflects that Kirk had spent a total of 110 days incarcerated.

7

IV.     Whether the trial court erred by prohibiting defense counsel from cross examining the victim regarding a drug hair follicle test on grounds of relevancy.

V.     Whether the trial judge committed reversible error with regard to jury deliberations following the trial.

Each assignment of error is considered in turn.

## ANALYSIS

**I.     Whether it was plain error for the trial court to permit a law enforcement officer to testify to medical causation, that the victim's injuries appeared to be a result of strangulation, in a case in which strangulation was an element of the crime charged in the indictment.**

¶16.   Kirk recognizes that no contemporaneous objection was forthcoming when Deputy Strait testified at trial regarding the marks he had observed on Casey Kirk's neck. On direct examination, when asked about Casey's demeanor, Strait testified that he "noticed around her neck she had strangulation marks." He further testified that he requested an ambulance "due to her complaining about her throat being sore and obviously because of the bruising and things that can happen in a strangulation to the neck." And when asked about the incident report he prepared on the day in question, Strait responded: "She indicated that there was shoving, hitting with a closed fist, and a slap with an open hand, beating up, and strangulation." But, in spite of the failure of trial counsel to interpose an objection, Kirk claims that the doctrine of plain error applies.

¶17.   Generally, preservation of an issue for appeal requires a contemporaneous objection at trial. *Christmas v. State*, 10 So. 3d 413, 421 (Miss. 2009) (quoting *Walker v. State*, 913

So. 2d 198, 238 (Miss. 2005)). The doctrine of plain error permits this Court to consider, in spite of a lack of a contemporaneous objection at trial:

> obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right. For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Johnson v. State*, 2014 WL 971542, *4 (Miss. March 13, 2014) (quoting *Burdette v. State*, 110 So. 3d 296, 303 (Miss. 2013) (quoting *Conners v. State*, 92 So. 3d 676, 682 (Miss. 2012))). Kirk claims that, "[w]ith no expert witness, no eye-witnesses, and witnesses with mere reiterations of Casey Kirk's testimony, the State improperly introduced medical expert testimony through a lay law enforcement witness to salvage its case." According to Kirk, this violated his "right to a fair trial by misleading and blatantly poisoning the jury with unreliable 'expert testimony.'" The State responds that Strait "did not offer an opinion as to whose hand made the mark, but only offered an opinion that the marks were consistent with strangulation."

¶18.    Mississippi Rule of Evidence 701 permits lay testimony "in the form of opinions or inferences," so long as those opinions or inferences are:

> (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Miss. R. Evid. 701. Mississippi Rule of Evidence 702, however, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . .

9

Miss. R. Evid. 702. In the present case, Kirk was indicted for aggravated domestic violence under Mississippi Code Section 97-3-7(4); the State alleged in the indictment that he "did unlawfully, knowingly, feloniously, and intentionally hit and strangle or attempt to strangle Casey Kirk, a human being, at a time when Casey Kirk was [Defendant Marvin Kirk's] spouse." The jury which found Kirk guilty was instructed that "'[s]trangle' means to restrict the flow of oxygen or blood by intentionally applying pressure on the neck or throat of another person by any means or to intentionally block the nose or mouth of another person by any means." *See* Miss. Code Ann. § 97-3-7(9)(a) (Rev. 2014), the source of this statutory definition.

¶19.    This Court has held that, "[b]ecause the public hold police officers in great trust, the potential harm to the objecting party requires reversal where a police officer gives expert testimony without first being qualified as such." ***Roberts v. Grafe Auto Co., Inc.***, 701 So. 2d 1093, 1099 (Miss. 1997). In that case, this Court reversed where the trial court allowed a police officer, admittedly not an expert in accident reconstruction, to testify that "driver error did not contribute to the accident, the very issue to be determined at trial." ***Id.*** Here, an issue to be determined at trial was whether the injuries sustained by Casey were caused by strangulation. The jury had seen photographs, exhibits introduced by the State, of Casey's neck. While Deputy Strait may have been able to testify regarding his observations, e.g., that Casey's neck had red marks on it, his testimony that it appeared Casey had been strangled constituted the sort of testimony properly reserved to an expert.

¶20.    Nevertheless, the defense waived any potential objection to this testimony by, instead of objecting to or moving to strike Strait's testimony regarding strangulation or moving for

10

a mistrial, emphasizing it on cross examination. *See Copeland v. Copeland*, 904 So. 2d 1066, 1073 (Miss. 2004) (citing **De La Beckwith v. State**, 707 So. 2d 547, 574 (Miss. 1997) ("Failure to make a contemporaneous objection constitutes waiver of the objection and cannot be raised for the first time on appeal because the trial court is denied the opportunity to consider the issue and possibly remedy the situation."); **Goldsby v. State**, 240 Miss. 647, 123 So. 2d 429, 441 (1960) ("[A]ppellant's failure to move for a mistrial waived any further objection . . . ."). The exchange between *defense counsel* and Deputy Strait proceeded during cross examination as follows:

> Q: So when you got to the house and you saw Casey, what made you assume that the marks on her neck were strangulation marks, since you've testified?
>
> A: You could obviously see the fingerprints and things of that nature on her neck. Not fingerprints, but the indentation of fingers. You could tell it wasn't a rope or anything. You could tell that somebody actually put their hand around her neck and strangled her.
>
> . . . .
>
> Q: Do you have any kind of medical background?
>
> A: No, ma'am.
>
> Q: So can you say with any certainty that the marks on her neck were from strangulation?
>
> A: Well, they didn't just appear there.
>
> Q: But that wasn't my question.
>
> A: Actually you can see where it looks like fingers have been on her neck and disclosed.
>
> Q: I'm going to hand you State's Exhibits 11, 12, and 13. These have been published to the jury prior also.

A:  Do what?

Q:  The jury has seen these already. Can you see the actual marks, the finger marks that you're describing, on these pictures?

A:  Yes, ma'am. You can see the round indentation. See here: Round indentation, round indentation, round indentation, round indentation.

Q:  Now, let me ask you this. These round indentations or these round marks that you're talking about, were they ever compared to Marvin's hand to see if they were the same size? Might have been somebody else's hand. Might have been Casey's hand?

A:  I have no idea, ma'am. I don't know.

Q:  Is it possible it couldn't have been a hand at all?

A:  In my opinion it is a hand.

¶21. This Court considered a case in which Robert Lee Goldsby was convicted of capital murder in the Circuit Court of the First Judicial District of Hinds County[4] and sentenced to death. *Goldsby*, 123 So. 2d at 431. At trial, the State examined Sheriff Byrd, who had investigated the crime, about another party's accusation of the defendant. *Id.* at 441. But "the witness apparently became confused, and stated that Goldsby admitted killing Mrs. Nelms, while he was at the Holmes County jail." *Id.* at 441. This Court held that, because "[a]ppellant did not ma[k]e a motion for a mistrial . . . his failure to do so waived whatever error occurred in Sheriff Byrd's non responsive answer to the question of State's counsel." *Id.* As in *Goldsby*, Deputy Strait's answers to the State's questions regarding Casey's demeanor and Strait's request for an ambulance were nonresponsive when the witness

---

[4]Goldsby had been indicted in the Circuit Court of the Second Judicial District of Carroll County, but moved for a change of venue, which was sustained. *Goldsby*, 123 So. 2d at 431.

12

injected the subject of strangulation. Consequently, this issue is waived on appeal. Defense counsel failed to move for a mistrial. Nor did defense counsel object or move to strike the nonresponsive testimony. Instead, defense counsel interrogated Strait not only in an effort to call into question Strait's expertise regarding strangulation, but also to adduce one of the defense's theories of the case, that the marks on Casey's neck had been self-inflicted.

¶22.    Defense counsel cannot now attempt to assign this error to the trial court. It certainly cannot claim that it was an "obvious error which was not properly raised by the defendant and which affects a defendant's fundamental, substantive right," nor was it "an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 2014 WL 971542, *4.

¶23.    The error now complained of may be raised in a post-conviction proceedings as a claim of ineffective assistance of counsel. For the purposes of Kirk's direct appeal, we find his assignment of error to be of no merit.

**II.     Whether the trial court erred by denying the Appellant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.**

¶24.    The standards for review of a denial of a judgment notwithstanding the verdict (JNOV) and for denial of a new trial require differing analyses. A denial of a judgment notwithstanding the verdict is subject to *de novo* review on appeal. *Daniels v. State*, 107 So. 3d 961, 963 (Miss. 2013) (citing *Johnson v. St. Dominics-Jackson Mem'l Hosp.*, 967 So. 2d 20, 22 (Miss. 2007)). "A motion for JNOV is a challenge to the legal sufficiency of the evidence." *Id.* Conversely, "[a] motion for a new trial falls within a lower standard of review than does that of a judgment notwithstanding the verdict . . . . A motion for a new trial simply

13

challenges the weight of the evidence." ***Daniels***, 107 So. 3d at 963 (quoting ***Sheffield v. State***, 749 So. 2d 123, 127 (Miss. 1999). We address the sufficiency and the weight of evidence presented in the case against Kirk each in turn.

*A.    Sufficiency of the Evidence*

¶25.    In considering the legal sufficiency of the evidence, "this Court will affirm the denial of a motion for JNOV if there is substantial evidence to support the verdict." ***Daniels***, 107 So. 3d at 963 (citing ***Johnson***, 967 So. 2d at 22). "'Substantial evidence' is information of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions." ***Daniels***, 107 So. 3d at 963 (quoting ***Natchez Elec. & Supply Co. v. Johnson***, 968 So. 2d 358, 362 (Miss. 2007)). This Court considers "whether the evidence shows 'beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.'" ***Bush v. State***, 895 So. 2d 836, 843 (Miss. 2005) (quoting ***Carr v. State***, 208 So. 2d 886, 889 (Miss. 1968)). This Court has held:

> Should the facts and inferences considered in a challenge to the sufficiency of the evidence "point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty," the proper remedy is for the appellate court to reverse and render.

***Bush***, 895 So. 2d at 843 (quoting ***Edwards v. State***, 469 So. 2d 68, 70 (Miss. 1985) (citing ***May v. State***, 460 So. 2d 778, 781 (Miss. 1984))). However,

> if a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach

14

different conclusions on every element of the offense," the evidence will be deemed to have been sufficient.

*Bush*, 895 So. 2d at 843 (quoting *Edwards*, 469 So. 2d at 70). "The evidence is viewed in the light most favorable to the verdict." *Daniels*, 107 So. 3d at 963 (citing *Johnson*, 967 So. 2d at 22).

¶26.    Mississippi Code Section 97-3-7(4)(a)(iii) sets forth the requirements for proving a charge of aggravated domestic violence: "When the offense is committed against a current or former spouse . . . a person is guilty of aggravated domestic violence who . . . [s]trangles or attempts to strangle another." Miss. Code Ann. § 97-3-7(4)(a)(iii) (Rev. 2014). "Strangle" means "to restrict the flow of oxygen or blood by intentionally applying pressure on the neck, throat or chest of another person by any means or to intentionally block the nose or mouth of another person by any means." Miss. Code Ann. § 97-3-7(9)(a) (Rev. 2014). In order to prove allegations of aggravated domestic violence for which Kirk was indicted, the State bore the burden at trial of proving (1) that Marvin and Casey Kirk were current or former spouses and (2) that Marvin Kirk had strangled Casey Kirk by restricting "the flow of oxygen or blood by intentionally applying pressure on" Casey's neck.

¶27.    The State adduced testimony at trial that Marvin and Casey Kirk were married. Casey Kirk testified that Marvin "grabbed me by my neck, and he started choking [] me . . . . I couldn't even cry or scream or anything because he had his hands on my neck and he was choking me." She testified that she "wasn't able to breathe." Casey testified that, the next day, Marvin choked her again; she could not breathe and lost consciousness. Casey identified the pictures, State's Exhibits 11, 12, and 13, as the result of "him choking me."  Colita

15

Ogletree, who provided refuge to Casey in her home after Casey fled her own home, recalled that Casey's neck was red. The recording of the 911 call which Casey had placed shortly after arriving at Ogletree's house was played for the jury.

¶28. Deputy Strait testified to marks on Casey's neck. The other deputy called to investigate, Deputy Brad Sullivan, testified that he "noticed that [Casey] had red marks on her neck that she was pointing out to Deputy Strait . . . ." Sarah Horvath, a friend of both Marvin and Casey Kirk, testified for the State that she and Marvin had a telephone conversation regarding the events. She testified that, during this conversation, Marvin testified that "he f***ed up and that he ruined his family."

¶29. Kirk argues on appeal that the only evidence of strangulation, "this fundamental element of the crime was the uncorroborated testimony of the Accuser, a self-admitted meth addict." Kirk states that "the State moved forward without a medical expert to substantiate the Accuser's claims that she was strangled" and that "[t]he only evidence the State presented in an attempt to corroborate the meth-addict's testimony was the testimony of Deputy Strait, which was a mere reiteration of the accuser's version of events." But, even in the absence of testimony from an expert, Deputies Strait and Sullivan and Colita Ogletree, who all saw Casey on the day in question, testified to marks they observed on her neck. The jury observed photographs of Casey's neck taken by Deputy Strait on the day in question. The jury reasonably could infer from this testimony and from the photographs that the red marks on Casey Kirk's neck were sustained as a result of strangulation by Marvin Kirk.

¶30. Viewing the evidence in the light most favorable to the guilty verdict, we find that any rational juror could have found beyond a reasonable doubt that the defendant was guilty. As

16

such, the verdict was supported by substantial evidence and the trial court did not err in denying Kirk's motion for JNOV.

### B. Weight of the Evidence

¶31. In reviewing the denial of a motion for a new trial "based on an objection to the weight of the evidence," this Court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush*, 895 So. 2d at 844 (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)). And while "the court sits as a thirteenth juror," the motion for new trial "is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Bush*, 895 So. 2d at 844 (quoting *Amiker v. Drugs For Less, Inc.*, 796 So. 2d 942, 947 (Miss. 2000)). As with a sufficiency analysis, when considering the weight of the evidence, "the evidence should be weighed in the light most favorable to the verdict." *Bush*, 895 So. 2d at 844 (citing *Herring*, 691 So. 2d at 957).

¶32. In arguing that allowing the verdict in the present case to stand would sanction an unconscionable injustice, Kirk reiterates his sufficiency argument that "[a]bsent any reliable medical evidence on strangulation against the Appellant, the State's case must rely upon the inconsistent and implausible allegations of Casey Kirk." But, again, ample testimony at trial supported the guilty verdict. Deputies Strait and Sullivan and Colita Ogletree testified they had observed red marks on Casey's neck on the day in question. Photographs of Casey taken on the day of the alleged strangulation were viewed by the jury. This evidence, coupled with Casey's testimony that Marvin had strangled her, supported the jury's verdict. The jury

17

reasonably could infer from the testimony and the photographs adduced at trial that Marvin Kirk strangled his wife.

¶33. We find that, when viewed in the light most favorable to the verdict, the evidence does not preponderate heavily so heavily against the verdict that to allow it to stand would sanction an unconscionable injustice. Thus, we hold that the trial judge correctly denied Kirk's motion, in the alternative, for a new trial.

### III. Whether the trial court abused its discretion in excluding letters and a text message.

¶34. Kirk claims that the trial court abused its discretion by excluding letters and text messages sent to him by Casey Kirk.

¶35. Before trial, the State filed Motion in Limine 2, in which it sought an "order precluding the defendant or defense counsel or witness from mentioning or presenting evidence in any way in the presence of the jury at any time during this trial a handwritten letter which is three (3) pages long which is copied on 2 pages." Apparently "written by the victim in this case" and "delivered or sent to the defendant in this case," the letter, according to the State "in no way indicates guilt or innocence of the defendant since it apparently was written months before the crime and thus [is] irrelevant in this case."

¶36. Likewise, State's Motion in Limine 3 sought to preclude mention of a letter from the victim to the defendant five months after the crime which "indicate[s] that the victim was at the time undergoing drug rehabilitation." Finally, the State sought to exclude, through Motion in Limine 5, "pictures of what is purported to be texts from the victim to the defendant." Defense counsel, at the motion hearing, informed the trial court that the victim

18

wrote the letters herself "talking about how wonderful a husband, how wonderful a father he [Kirk] is." The text message, according to Kirk's counsel, contained the following message from Casey Kirk to Marvin Kirk: "I'm sorry for what I did[.] I'll have to pay for that the rest of my life[.] I never meant to hurt you."The State argued in its motions *in limine* that the letters and text message were not relevant.

¶37.    At the motion hearing, the State presented its relevancy objection, and Kirk took the position that the letters were admissible as a present-sense impression and that the text message was admissible as an admission against interest. Despite the State's objection to relevancy, the trial court ruled that "the letter in relation to State's motion in limine 2 and State's motion in limine 3 and the text in relation to State's motion in limine 5 are not admissible because they're hearsay." On appeal, Kirk argues that his fundamental right to a fair trial was violated by the trial court's ruling that the letters and text message were inadmissible hearsay. This Court reviews "the admission or exclusion of evidence at trial for an abuse of discretion . . . ." *Ferguson v. State*, 137 So. 3d 240, 245 (Miss. 2014) (citing *Williams v. State*, 991 So. 2d 593, 597 (Miss. 2008)). The trial court "enjoys a great deal of discretion as to the relevancy and admissibility of evidence. Unless the judge abuses this discretion so as to be prejudicial to the accused, [this] Court will not reverse [the] ruling." *Ferguson*, 137 So. 3d at 245 (quoting *Shaw v. State*, 915 So. 2d 442, 445 (Miss. 2005)).

¶38.    First, Kirk claims the letters and text were admissible because they were relevant, arguing that they "had more than a tendency to make the existence of a fact more or less probable," since they "would assist the jury in its fact-finding task to determine whether the allegations against the Appellant were true." It is true that evidence is relevant which has

19

"any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss. R. Evid. 401. But Mississippi Rule of Evidence 402 provides that relevant evidence is admissible, "except as otherwise provided by . . . these rules." Miss. R. Evid. 402. Thus, relevancy has no bearing on whether the letters and text message constituted inadmissible hearsay, which the trial court found held they did.

¶39.    Rule 801(c) of the Mississippi Rules of Evidence provides the definition of hearsay: "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Miss. R. Evid. 801. Kirk concedes that the letters and text message are hearsay but contends that they are admissible by virtue of two exceptions to the hearsay rule: (1) statement against interest, and (2) present-sense impression.

¶40.    A statement against interest, under Mississippi Rule of Evidence 804(b)(3), is defined as follows:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.

Miss. R. Evid. 804(b)(3). Kirk claims that the letters and text messages demonstrate that Casey Kirk perjured herself when she testified that her husband strangled her. But neither Casey's statements regarding Marvin's conduct as a husband and father, or her statements regarding drug treatment to which she testified, or her statements apologizing for some unknown misdeed "tended to subject [her] to civil or criminal liability, or to render invalid

20

a claim by [her] against another." Miss. R. Evid. 804(b)(3). More importantly, Rule 804(b) requires the unavailability of the declarant as a witness and lists those statements "not excluded by the hearsay rule *if the declarant is unavailable as a witness*." Miss. R. Evid. 804(b) (emphasis added). Here, the declarant, Casey Kirk, testified as a witness at trial; thus, she cannot be said to have been unavailable as a witness under any of the applicable "unavailability" definitions. *See* Miss. R. Evid. 804(a).

¶41. Next, Kirk claims that the letters and text message constituted a present-sense impression. Rule 803, which does not require the unavailability of a witness, defines a present-sense impression as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." Miss. R. Evid. 803(1). The comment states that the present-sense-impression exception "is based on the theory that the contemporaneous occurrence of the event and the statement render it unlikely that the declarant made a deliberate or conscious misrepresentation." Miss. R. Evid. 803(1) cmt. 1. While "[p]recise contemporaneity of the event and the statement may not be possible; a slight lapse may be permissible. Spontaneity is the essential factor." *Id.* Letters and text messages proceed from conscious deliberation of the author. The letters and text message here refer to past events and conditions and do not describe or explain an event or condition made while Casey "was perceiving the event or condition or immediately thereafter," as contemplated by Rule 803(1).

¶42. The trial court's exclusion of these letters and the text message cannot be said to have been an abuse of discretion. This Court finds no merit in Kirk's argument that the trial court

abused its discretion in disallowing the admission of two letters and a text message from the victim to the defendant.

> IV. **Whether the trial court erred by prohibiting defense counsel from cross examining the victim regarding a drug hair follicle test on grounds of relevancy.**

¶43. When Kirk's counsel attempted to cross examine Casey Kirk regarding a hair-follicle drug test that she had taken in April 2013, the State objected to relevancy. Casey had testified that she was not using crystal methamphetamine the weekend her husband allegedly strangled her. Kirk hoped to impeach Casey's credibility regarding whether she had used drugs on the weekend in question. During a bench conference, the trial court ruled that the evidence was not relevant. Kirk claims on appeal that this ruling constituted an abuse of discretion.

¶44. Relevant evidence is defined as evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss. R. Evid. 401. Kirk takes the position that the questioning regarding the hair-follicle drug test was relevant because it would make whether Marvin strangled Casey, a fact of consequence to the determination of the action, less probable because Casey was using drugs at that time. The theory of Kirk's case was that Casey "fabricated her injuries in order to get painkillers because Mr. Kirk had flushed the last of her crystal meth down the toilet."

¶45. While Kirk's trial counsel contended at the bench conference that "[t]he hair follicle test goes back for ninety days," the test did not show any particular dates upon which Casey had used crystal methamphetamine. Cross examination of Casey regarding the drug test had

22

no tendency to make the consequential fact, whether Marvin had strangled Casey, any more or less probable, nor did cross examination regarding the drug test make any more or less probable Marvin's theory that the case against him was a scheme devised by Casey in an effort to obtain medication. All the test showed was that, at some point during the ninety days prior to its administration in April 2013 (the precise date is not to be found in the record), Casey had used drugs. It does not suggest any likelihood that Casey had been using on the weekend of the alleged strangulation. Additionally, Casey testified that she had a problem with crystal methamphetamine and that she was, at the time of trial, residing at Jacob's Well Recovery Center. Kirk's brief inquired "[i]f the accuser were not using drugs at all during the weekend, why would the crystal meth be found on the bathroom floor?" This argument strains credulity.

¶46. Considering that evidence already had been adduced that Casey Kirk had a problem with crystal methamphetamine use, we find no merit in Marvin Kirk's argument that the trial court abused its discretion in ruling evidence of a hair-follicle drug test inadmissible on relevancy grounds.

### V. Whether the trial judge committed reversible error with regard to jury deliberations following the trial.

¶47. After more than two hours of deliberation, the bailiff informed the court that the jury foreperson needed to speak to the court. The foreperson informed the court that the jurors could not come to a unanimous verdict and that further deliberation was unlikely to help the jury to reach unanimity. The trial judge then instructed the foreperson to stand out in the hall "without going back into the jury room." With the foreperson in the hall, the judge discussed

23

with the lawyers the giving of a ***Sharplin*** instruction.[5] Neither the State nor Kirk's counsel

objected to the giving of the instruction.

¶48.    The court then asked the bailiff to summon the foreperson, whereupon he read the

following and inquired whether it would aid the jury in reaching a verdict:

> I know that it is possible for honest men and women to have honest differing opinions about the facts of a case, but if it is possible to reconcile your differences of opinion and decide this case, then you should do so.
>
> Accordingly, I remind you that the Court originally instructed you that the verdict of the jury must represent the considered judgment of each juror. It is your duty as jurors to consult with one another and to deliberate in view of reaching an agreement if you can do so without violence to your individual judgment.
>
> Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if you are convinced it is erroneous, but do not surrender your honest convictions as to the weight or the opinion of your fellow jurors or for the mere purpose of returning a verdict. Please continue your deliberations.

The foreperson responded, "I can only say it might." After instructing the foreperson again

to stand in the hall, the trial court recalled her and said, "I have decided that it's appropriate

for me to give that instruction to the entire jury." He then instructed the bailiff to retrieve the

remainder of the jury; when the jury had been assembled, the trial court read the ***Sharplin***

instruction. After the jury resumed deliberations, the bailiff informed the court that one juror

wanted to telephone home "just to let somebody know where they are." With no objection

---

[5]*See **Sharplin v. State***, 330 So. 2d 591 (Miss. 1976) (Court approved a jury instruction to be "given in either criminal or civil [cases] when the trial judge is confronted by a hung jury.")

24

from counsel, the trial judge permitted this "in the presence of the bailiff so he make[s] sure she doesn't give or receive any information."

¶49.    Kirk avers that the trial court committed reversible error by separating the foreperson from the rest of the jury and by allowing a juror to make a telephone call during deliberations.

¶50.    Kirk cites *Wilson v. State* for the following proposition:

> As to the dispersal of the jury, the defendant in a prosecution for felony is entitled to have the jury kept together without exception from the time it is selected until finally discharged. The separation of even one juror in such cases is an irregularity which will vitiate the verdict. Even at the request of the defendant, they cannot be dispersed in a capital case.

*Wilson v. State*, 248 So. 2d 802, 804 (Miss. 1971) (quoting *Clark v. State*, 209 Miss. 586, 48 So. 2d 127 (1950)) (internal citations omitted). "The purpose of the requirement is to prevent access to outside influences." *Id.* Of course, the Court in *Wilson* continued:

> We are of the opinion that the court has no power to authorize the separation of the jury during the trial of a *capital case*, either with or without the consent of the prisoner, except in cases of great necessity; and if it be done, and the prisoner be found guilty, a new trial will be granted.

*Wilson*, 248 So. 2d at 804 (quoting *Woods v. State*, 2 Morr. St. Cas. 1624, 43 Miss. 364, 372-73 (1870)) (emphasis added).

¶51.    The language cited to this Court by Kirk, however, is found only in capital cases, where jury sequestration is required. *See* URCCC 10.02 ("In any case where the state seeks to impose the death penalty, the jury shall be sequestered during the entire trial.") The rule in *capital cases* is that, "where the crime charged is punishable by death or a maximum of imprisonment for life in the state penitentiary, the jury shall be sequestered during the entire

25

trial and this right cannot be waived either by the attorney for the accused or at the discretion of the trial court." ***Cox v. State***, 365 So. 2d 627, 629 (Miss. 1978).

¶52.    As in ***Weaver v. State***, 272 So. 2d 636, 638 (Miss. 1973), "[t]he case before us is not a capital case." Aggravated domestic violence, for which Kirk was indicted and ultimately convicted, carries a maximum penalty of twenty years' imprisonment. Miss. Code Ann. § 97-3-7(4) (Rev. 2014). In fact, "in the absence of any evidence to the contrary we could not say that a defendant in a case less than capital was prejudiced by separation of the jury." ***Id.*** Here, the jury was unable to reach a verdict and the jury foreperson sought the intervention of the trial judge. It is unclear from the face of the record whether, as Kirk contends, the "foreperson stood in the hallway outside of the courtroom *alone* on two separate occasions." (emphasis in original). Even if she was alone in the hall, which the record does not make as clear as Kirk claims, the record does not reflect that the foreperson was in the hall for an extended period of time.

¶53.    Nevertheless, we observe that it was irregular for the court in these circumstances to separate the foreperson from the rest of her peers on the jury. Trial courts should not separate the jury during deliberations in this manner—capital case or otherwise. Further, the judge's soliciting the advice of the foreperson with regard to the utility of the ***Sharplin*** instruction (though, in the end, he ended up giving the ***Sharplin*** instruction anyway) was inappropriate and unnecessary. Nevertheless, considering the acquiescence of Kirk's counsel, and without any identifiable prejudicial effect on the jury, we find no reversible error. We caution bench and bar that this sort of practice could in some circumstances constitute reversible error and scrupulously should be avoided.

26

¶54.    At the commencement of the trial, the court admonished the jury with the following

instructions:

> One, you are not permitted to mix and mingle with the attorneys, parties,
> witnesses and spectators, and you are to avoid all contacts with such persons.
>
> Two, other than during the course of deliberation, you are not to converse with
> anyone about the case or any subject connected with the trial. Of course, you
> may inform your family members or other persons about your schedule.
>
> Three, prior to the case being submitted for jury deliberation, you are not to
> form or express an opinion on the case or any subject connected with the trial.
>
> Four, you are not to view any place connected with the case or any subject
> connected with the trial.
>
> Five, you are not to read, listen to or watch any news account or other matter
> relating to the case or any subject connected with the trial.
>
> Six, you are required to report to the court any communication or attempt to
> communicate with you on the case or any subject connected with the trial.
>
> Seven, you may not take notes during the course of the trial . . . .

Thus, this Court presumes that the jury followed the instruction of the trial court with regard

to conduct during the course of the trial. *Weaver*, 272 So. 2d at 638 (citing *Nicholson v.*

*State*, 254 So. 2d 881 (Miss. 1971)). We find no evidence in the record to support Kirk's

claim that the foreperson, or anyone else on the jury, failed to conduct themselves in

accordance with instruction from the trial court. This Court holds, therefore, that Kirk's claim

that the trial court committed reversible error by separating the foreperson from the rest of

the jury is without merit.

¶55.    Also, and in light of the presumption that the jury conducted itself in accordance with

the instructions from the trial court, we find Kirk's claim that allowing a juror to make a

telephone call during deliberations did not constitute reversible error. After the jury resumed deliberations following the trial court's reading of the *Sharplin* instruction to them, the bailiff informed the court that one juror wanted to telephone home "just to let somebody know where they are." With no objection from counsel, the trial judge permitted this "in the presence of the bailiff so he make[s] sure she doesn't give or receive any information." Any claim of prejudice to Kirk in allowing a juror to make a telephone call home to inform family why that juror had not yet returned home is belied by the record. The court instructed the jury that they could inform family regarding their schedules, and the bailiff was instructed to listen in on the telephone conversation to ensure that there was no exchange of information regarding the trial. Thus, this assignment of error is without merit.

## CONCLUSION

¶56.    Finding that Kirk's assignments of error are without merit, this Court affirms his conviction and sentence.

¶57. **CONVICTION OF AGGRAVATED DOMESTIC VIOLENCE AND SENTENCE OF TWENTY (20) YEARS, AS A NONVIOLENT HABITUAL OFFENDER, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SAID SENTENCE SHALL NOT BE REDUCED OR SUSPENDED; NOR SHALL THE APPELLANT BE ELIGIBLE FOR PAROLE, PROBATION OR ANY OTHER FORM OF EARLY RELEASE. UPON RELEASE, WITHIN NINETY (90) DAYS, THE APPELLANT SHALL PAY COURT COSTS, FEES AND ASSESSMENTS IN THE AMOUNT OF $898.50. ALL TIME SERVED IN PRE-TRIAL DETAINMENT RELATING TO THIS CHARGE SHALL BE CREDITED AGAINST THIS SENTENCE.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, CHANDLER, PIERCE, KING AND COLEMAN, JJ., CONCUR.**